```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
 2                    GREENBELT DIVISION

 3   _____
                                            )
 4   UNITED STATES OF AMERICA,              )
                                            )
 5        Plaintiff,                        )
                                            )Docket Number
 6             vs.                          )8:22-cr-00091-1
                                            )
 7   AKBAR MASOOD,                          )
                                            )
 8        Defendant.                        )
     _____)
 9
              TRANSCRIPT OF PRETRIAL CONFERENCE
10            BEFORE THE HONORABLE PAULA XINIS
             UNITED STATES DISTRICT COURT JUDGE
11           FRIDAY, AUGUST 23, 2024, AT 9:30 A.M.

12
     APPEARANCES:
13
     On Behalf of the Plaintiff:
14
          BY:  DARREN GARDNER, ESQUIRE
15             RANGANATH MANTHRIPRAGADA, ESQUIRE
          OFFICE OF THE UNITED STATES ATTORNEY
16        6406 Ivy Lane, Suite 800,
          Greenbelt, MD  20770
17        (301)344-4029

18
     (Appearances continued)
19

20

21

22

23

24        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

25
```

1   APPEARANCES CONTINUED:

2   On Behalf of the Defendant:

3        BY:   EUGENE GOROKHOV, ESQUIRE
                Burnham & Gorokhov, PLLC
4                1634 I Street NW
                Suite 575
5                Washington, D.C.  20006
                (202)386-6920

6

7        BY:   DANIEL GOLDMAN, ESQUIRE
                The Law office of Daniel Goldman, PLLC
                421 King Street, Suite 505
8                Alexandria, VA  22314
                (202)677-5709

9

10       BY:   JOSH GREENBERG, ESQUIRE
                The Josh Greenberg Law Firm
                1717 K. Street NW
11               Suite 900
                Washington, D.C.  20006
12               (202)422-0809

13   ALSO PRESENT:  Akbar Masood, Defendant

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2  (Court called to order.)

3    **DEPUTY CLERK:**  All rise.  The United States District

4  Court for the District of Maryland is now in session.  The

5  Honorable Paula Xinis presiding.

6    **THE COURT:**  Good morning, everyone.

7    (ALL COUNSEL:  Good morning, Your Honor.)

8    **THE COURT:**  You all can have a seat.  Will the

9  government call the case.

10    **MR. GARDNER:**  Your Honor, the government calls United

11  States v. Akbar Masood, Criminal Number PX-22-91.  AUSA Darren

12  Gardner on behalf of the United States.  Joined at counsel

13  table by AUSA Ranganath Manthripragada and Special Agent Joshua

14  Kimrey of Army CID.

15    **THE COURT:**  Good morning.

16    **MR. GOROKHOV:**  Good morning, Your Honor.  Eugene

17  Gorokhov here on behalf of Mr. Akbar Masood, who is present at

18  counsel table.  Also with me is my co-counsel, Daniel Goldman.

19    **MR. GOLDMAN:**  Good morning, Your Honor.

20    **MR. GOROKHOV:**  And also at counsel table, Your Honor,

21  is Joshua Greenberg.  He's an attorney.  He'll be entering an

22  appearance in this case.

23    **THE COURT:**  All right.  Thank you, and welcome

24  everybody.  Give me a minute.  I'm just going to pull up what

25  we received last night.

4

1          **DEPUTY CLERK:**  Defense counsel, could you pull the

2    microphone a little closer to you, please?

3          **MR. GOROKHOV:**  Yes.

4          **THE COURT:**  Do we have any possible witnesses in the

5    courtroom?  Because if we do, I would like to invoke the rule

6    now so I can have a candid conversation with counsel about what

7    we received last night.

8          **MR. GARDNER:**  Your Honor, yes.  We have Agent Michael

9    Jeffers of CID.  He's with the cyber team.

10         **THE COURT:**  Okay.  All right.  Well, if you would ask

11   for him to step out while we talk, that would be great.

12         **MR. GOROKHOV:**  Your Honor?

13         **THE COURT:**  Yes.

14         **MR. GOROKHOV:**  I believe under the circumstances,

15   we -- our position would be that it would also be appropriate

16   to exclude the case agent, Joshua Kimrey.  This is not a trial,

17   and the matters discussed, I think, are -- it's important to

18   keep the record clean with respect to the facts of this case.

19         **THE COURT:**  I mean, I think provisionally, that's a

20   good idea.  I have a lot of questions that are very detailed.

21   And we may need to hear from you, Agent Kimrey, at some point.

22   So if you would step out, I would appreciate it.  Thank you.

23         Okay.  What I would like to do is, first, go over what I

24   received and hopefully to confirm that the defense received the

25   same last night.

```
 1        Then I want to go over the letter that you sent,
 2   Mr. Gardner, and I want to go through almost line by line and
 3   get some detail from you.  And we'll take it -- after that, we
 4   will figure out where we are.  Because there's a lot of moving
 5   parts, and I want the record to be clear.
 6        Okay.  So last night, I'd say by 4:30, I received, via
 7   Egnyte, the first set of documents, and there were 488 items in
 8   that -- in that set.  They are not -- they appear to me to be
 9   exhibits for trial; is that accurate?
10             MR. GARDNER:  Yes, Your Honor.
11             THE COURT:  Okay.  And nothing else but exhibits for
12   trial are in that first 488 item production?
13             MR. GARDNER:  Correct, Your Honor.
14             THE COURT:  Okay.  And then the second set, which I
15   think we received maybe an hour later, and I saw your
16   correspondence, and I think I responded to it, the slower
17   production was 21 items, and those are responsive to my order
18   that you produce anything related to the seizure of the
19   devices, the search warrants, so we can establish chain of
20   custody among other things today; is that correct?
21             MR. GARDNER:  That's correct, Your Honor.
22             THE COURT:  Okay.  Have there been -- one, did you
23   produce them to the defense?
24             MR. GARDNER:  Yes, Your Honor.
25             THE COURT:  Okay.  Defense, any issue with that?  Is
```

1    that what you received?

2            **MR. GOLDMAN:**  I'll just say, Your Honor, that we did

3    receive a batch of exhibits at roughly the same time as the

4    Court.  The chain of custody documents, we didn't receive

5    until, I believe, 9:07 p.m.

6            **THE COURT:**  Okay.  So late, but you got them?

7    Because we're going to go through each one.

8            **MR. GOLDMAN:**  I -- I can't say if they are the same

9    as what the Court received.

10            **THE COURT:**  Let's make sure.

11            **MR. GOLDMAN:**  Obviously I -- we did receive them.

12    They were loaded to USAfx at 9:07, and we reviewed them shortly

13    thereafter.  We will be able to determine --

14            **THE COURT:**  So as we go through each of them, if

15    there is something that you have that's new or different,

16    please let me know so we'll figure it out.  Okay?

17            **MR. GOLDMAN:**  Yes, ma'am.

18            **THE COURT:**  All right.  So that's that.

19        And then about 10:30, I believe you filed on ECF your

20    letter, which is at ECF 247; is that correct?

21            **MR. GARDNER:**  Yes, Your Honor.

22            **THE COURT:**  Anything we're missing?

23            **MR. GARDNER:**  Your Honor, we did send a witness list,

24    I don't know if you received that --

25            **THE COURT:**  I did not.

1            **MR. GARDNER:**  -- in addition to the letter.

2            **THE COURT:**  Okay.  Where did you send that?

3            **MR. GARDNER:**  I thought I uploaded that to the

4     portal.  I think we did send it to the defense counsel.  So if

5     you didn't receive it, Your Honor, that's our mistake.

6            **MR. GOLDMAN:**  We did receive the witness list

7     sometime in that period of the afternoon to early evening.

8            **THE COURT:**  Okay.  I have not seen it.

9         Can someone e-mail it to Mr. Ulander, and then he can

10    print it out for me.  Or hard copy, and we can copy it.  Either

11    one.  But I would like to have it now so I know what's

12    happening.

13           **MR. GARDNER:**  We'll do that, Your Honor.

14           **THE COURT:**  All right.  So going through -- and what

15    I'm going to do is name each of the documents in that second of

16    the 21 items.  I'm going to name them as you've named them in

17    the PDF, and then confirm what they are.

18        So the first one, which is labeled 1.22970 seems to be --

19    it says affidavit in support of application of search warrant

20    for target premises one and two.  That's the same as ECF 136-1,

21    right?  It's the subject of the defense's motion?

22           **MR. GARDNER:**  Yes, Your Honor.

23           **THE COURT:**  Defense agrees?

24           **MR. GOLDMAN:**  I need to be able to see exactly --

25    which document are you -- I have the search warrants for --

8

1   search warrants and affidavits for the search of Mr. Masood's

2   home and the --

3           **THE COURT:**  Yeah, so where I am right now is in

4   the -- in the set of documents that were produced last night to

5   you in response to my order regarding all documents related to

6   the devices --

7           **MR. GOLDMAN:**  To the devices.

8           **THE COURT:**  -- and the chain of custody.

9           **MR. GOLDMAN:**  Chain of custody.

10          **THE COURT:**  So I'm literally going in order of what

11  the government uploaded to Egnyte so I know what they are, you

12  know what they are, and confirm that we all got the same thing.

13          **MR. GOLDMAN:**  So we received a folder, I believe it

14  9:07, that was labeled chains of custody.  So let me just open

15  that folder so I can follow along with you.

16          **THE COURT:**  Sure.  Exactly.  Right.  Yep.  Let me

17  know when you're ready.

18          **MR. GOLDMAN:**  Thank you.

19      Mr. Gorokhov has it quicker than me, and he has them up,

20  so -- okay.

21      Thank you.

22          **THE COURT:**  Okay.  So that's the first document that

23  I have, is the search warrant that is ECF 136-1.  And it's, I

24  believe, the subject -- no, hold on.  Nope.  This is not --

25  this is St. Michael Place.  Let me make sure of that.  Let me

9

```
1  make sure we're looking at the same thing.  I tried to print
2  them out as well as have them in -- yep.
3       So St. Michael Place, I believe, is Ms. Jackson; is that
4  right?  The first search warrant application for premises one
5  and two; is that right?  Sir Michael Place, isn't that
6  Defendant Jackson?
7            MR. MANTHRIPRAGADA:  Yes, Your Honor.
8            THE COURT:  All right.  Well, that's number one.
9       Number two is 22SW223224, another search warrant
10  affidavit, which appears to be for the Reston, Virginia,
11  address, Sunset Hills and Falls Chase Court.
12       That's Mr. Masood's home and Case; is that right?
13            MR. GOLDMAN:  If I could just note for the record,
14  that's correct what Your Honor just said.  But the documents
15  that we have are in separate folders and in a different order
16  than what Your Honor is reading from, so it's making it a
17  little bit difficult to follow to make sure that we have the
18  same things.
19       I know that we do have the search warrant and affidavit
20  for the search of Mr. Masood's home.  Those were provided to us
21  in a separate upload of two documents, so we did receive that
22  mid afternoon yesterday.
23            THE COURT:  Okay.  All right.  So this may be -- this
24  might get interesting as we get into some of these documents.
25  I'll try to go slowly.
```

1       The next one I have is titled 20200302 AIR collection of

2  evidence.  Okay.  And it is a one-page document that appears to

3  be dated -- the date of the report is August 7, 2020.  Am I

4  right about that?  2020?  August 7, 2020, at the bottom

5  right-hand corner.  But the top references events that took

6  place on March 2, 2020.

7       Am I right about that?

8            **MR. MANTHRIPRAGADA:**  Yes, Your Honor.

9            **THE COURT:**  Okay.  All right.  So that's -- do you

10  have that?

11            **MR. GOLDMAN:**  So ours are organized in folders based

12  on the target location, so it's very hard to tell whether we --

13  I assume we have it, but I can't tell from --

14            **THE COURT:**  I don't know if you do or you don't.

15  Right?  And I'm just curious about things, like, what is this,

16  what's the date.  We're going to talk about why I have it.  I

17  have a feeling I have it because it's Ms. Rosas.

18            **MR. GOLDMAN:**  I think our preference would be if the

19  Court wants to go through it with the government, I don't think

20  we're in a position to be able to confirm whether we have it or

21  don't have it in this moment.

22            **THE COURT:**  Like, in real time?  Yeah.

23            **MR. GOLDMAN:**  In real time, because I think it's

24  going to -- we don't have an index or something that tracks it.

25            **MR. GARDNER:**  Your Honor, I think I might be helpful.

 1           **THE COURT:**  Sure.

 2           **MR. GARDNER:**  So what Your Honor received I think

 3  through the portal --

 4           **THE COURT:**  Yeah.

 5           **MR. GARDNER:**  -- it took documents out of folders and

 6  just sort of gave them to you in long form, that's why you're

 7  viewing them in the way you are.

 8           **THE COURT:**  Okay.

 9           **MR. GARDNER:**  And that's how it uploaded.  But as

10  we're going through, it's starting at the top.

11     So the first folder -- right now we're in the first

12  folder, the top one, that would be the Case --

13           **MR. GOLDMAN:**  So the order we have is Case collection

14  of HMA e-mails, collection of Infused e-mails, Jackson, Masood,

15  Peebles.

16           **MR. GARDNER:**  And that should be the order that the

17  Court has.  I found it in my first folder, first document.  So

18  as we go through, I think that would be a good way to keep

19  track.

20           **THE COURT:**  Okay.  And I understand, Mr. Greenberg,

21  you're not -- like, you're going through them as diligently as

22  you can right now, in the event, like, as we're talking it

23  turns out you don't have something that I have, just let me

24  know.

25     But I just want to know what these are at this point.  I'm

1    assuming -- you probably know better than I do.  But I would

2    like to know what they are.

3               **MR. GOLDMAN:**  Just for clarification, I'm

4    Mr. Goldman, this is Mr. Greenberg.

5               **THE COURT:**  Sorry, Mr. Goldman.

6               **MR. GOLDMAN:**  Not at all.

7               **THE COURT:**  There's a lot of Gs.  I'm learning all

8    these names really quickly.  Sorry, I apologize for that,

9    Mr. Goldman.

10              **MR. GOLDMAN:**  That's all right.  Thank you.

11              **THE COURT:**  All right.  The next one up is titled

12    2020115AIR00, et cetera.  It appears to be a one-page document

13    dated on the bottom November 17, 2020, relating to events that

14    took place on November 13, 2020, receipt of documents from

15    Ms. Salvator O'Donnell.

16       Is that it?  That's the one you've got?  Looking at the

17    right one?  Yeah.

18       I do note, and I might ask some questions along the way

19    just to confirm what's going on with these, but it references

20    an Enclosure B.  Is that -- what is Enclosure B, do we know?

21    If we don't know now, that's fine.  I just want to get sort of

22    a full record of what this stuff is.

23              **MR. GARDNER:**  And that's an HMA folder, the document

24    she's referencing.

25              **THE COURT:**  Okay.  So we may -- I'm going to see that

1  at some point.

2      All right.  The next one is entitled -- let me make sure.

3  It's a one-page document entitled AIR collection of evidence at

4  Jackson residence.  It's dated April 6th, 2022, which

5  memorializes -- oh, great, thank you -- memorializes apparently

6  what was taken from Ms. Jackson's home on that date.  Am I

7  right about that?

8          **MR. GARDNER:**  Yes, Your Honor.

9          **THE COURT:**  Okay.  I thought I had seen, but I was

10  sort of trying to piece it together, Enclosures 1 through 10

11  that are referenced in this document.  Are they anywhere in

12  this -- let me ask it that way.

13      Is that enclosures -- the document titled Enclosures 1

14  through 10, is that related to Jackson?

15          **MR. GARDNER:**  Yes, Your Honor.

16      And for counsel's reference, that's all in the Jackson

17  folder.

18          **THE COURT:**  All right.  Let me get to that.

19      Okay.  So then I'm clear, these are the inventories of

20  everything that was taken from Ms. Jackson's home on that day?

21          **MR. GARDNER:**  Yes, Your Honor.

22          **THE COURT:**  As well as the chain of custody for each

23  of those?

24          **MR. GARDNER:**  Yes, Your Honor.

25          **THE COURT:**  Okay.  So that's Enclosures 1 through 10,

1   as it's labeled to me.

2       The next one is one-page document, AIR collection of

3   evidence at Masood residence.  Okay.  And it -- it references

4   four enclosures which actually in mine were nested in the PDF.

5   So when I go through those, I have them -- right now, I have

6   them attached to this one-page document.  Let me confirm, these

7   are all the items, both documents and devices, that were

8   removed from Mr. Masood's home.

9       Am I right about that?

10          **MR. GARDNER:**  Yes, Your Honor.

11          **THE COURT:**  At Falls Chase Court, correct?

12          **MR. GARDNER:**  Yes, Your Honor.

13          **THE COURT:**  And they are the complete chains of

14   custody for all of those items?

15          **MR. GARDNER:**  Your Honor, those are the chains of

16   custody basically logging everything into the evidence room.

17          **THE COURT:**  Yeah.

18          **MR. GARDNER:**  Agent Kimrey will basically say that

19   they have a separate system, once it gets into the evidence

20   room, where it's signed out individually.  That document is --

21   is being downloaded right now.  The issue was, there was nobody

22   in the evidence room yesterday to get it.  So he can testify,

23   and the other agent that we brought --

24          **THE COURT:**  I want the documents.  I want the

25   documents.

1          **MR. GARDNER:**  Understood, Your Honor.

2          **THE COURT:**  Because these, right now, we're going to

3    talk about this.  This looks like these devices have just

4    disappeared.  Okay?

5          All right.  The next one up that I have is AIR search

6    arrest of Peebles, which is an investigation -- one-page -- no

7    two-page investigation report which appears to document the

8    search and arrest of Ms. Peebles on April -- well, the report

9    is April 15, 2022.  It documents the events of April 6th, 2022.

10         Is that correct?

11         **MR. GARDNER:**  Yes, Your Honor.

12         **THE COURT:**  Okay.  Now, this document references

13   seven enclosures.  Did you include those enclosures in this

14   production?

15         Let me ask it a different way.

16         Is Peebles return, which is the last document that I have,

17   which is a five-page document, it has United States District

18   Court warrant by telephone or other reliable electronic means

19   as its cover, and then it has a number of what looked like

20   chain of custody documents.  Is that at all related to AIR

21   search Peebles?

22         **MR. GARDNER:**  It is, Your Honor.

23         **THE COURT:**  All right.  Well, then let's match it up.

24   Okay.  Well, it's related, but it's not complete.  That's how

25   I'm seeing it.

1    So -- so Peebles return, which is labeled as Peebles

2  return is a one, two, three, four, five-page document, and it

3  has United States District Court for the District of Maryland.

4  The title of this is warrant by telephone or other reliable

5  electronic means.  Judge Day signed it.

6    And then attached to it, it says see attached inventory

7  list, and with it are -- there's a one, two, three --

8  three-page inventory that lists both docs -- documents, boxes

9  of documents going one through eighteen, and then eight

10  devices, electronic devices.  Okay?

11    So I'm hearing the government say that that matches to the

12  search and arrest report of Ms. Peebles that we were talking

13  about.  But for whatever it's worth, I note that there's other

14  things in these enclosures, CDs containing photographs, videos,

15  a sketch, et cetera.  We'll talk about whether the defense has

16  received those later.  I just want to make sure I connect

17  these.

18    All right.  Next one is titled AIR warrant Case HCS,

19  6 April, 2022.  It appears to be a two-page document dated on

20  the bottom April 18th, 2022, involving the April 6th execution

21  of the search warrant of Case Healthcare Solutions.

22    Am I right about that?

23        **MR. GARDNER:**  Yes, Your Honor.

24        **THE COURT:**  Okay.  Now, what -- and then the next

25  document I have is Case HCS return, which goes with this

1  investigation report.

2       Am I right about that?

3            **MR. GARDNER:**  Yes, Your Honor.

4            **THE COURT:**  So the Case HCS return is the search

5  warrant inventory and chain of custody.  Am I right about that?

6            **MR. GARDNER:**  Yes, Your Honor.

7            **THE COURT:**  Okay.  And, again, there are enclosures

8  in this report referenced, not attached.  You all can talk to

9  me about that later.

10      Okay.  Next one up that I have is titled data extraction

11  report.  It's a two-page document.  It's dated May 1, 2020.

12      Is there anything that's attached to this document?

13           **MR. GARDNER:**  One moment, Your Honor.  I'm trying to

14  locate that document.

15      No, Your Honor, it doesn't look like there are attachments

16  to that document.

17           **THE COURT:**  Just so I understand it, who is the

18  author of this document?  Is it Mr. Mahon, M-A-H-O-N, who

19  electronically signed it?

20           **MR. GARDNER:**  Yes, Your Honor.

21           **THE COURT:**  Okay.  Enclosure -- the next one that I

22  have is Enclosure 1, Peebles arrest warrant, and it's a

23  one-page arrest warrant.

24      The next one I have is the search warrant return.  Let's

25  see, for -- this is a two-page document.  It appears to have

1    been signed by Judge Davis in the Eastern District of Virginia

2    to search 12110 Sunset Hills Road.  It references attachments

3    A2 and B, and an attached evidence voucher.

4        Government, can you tell me what this is and what it goes

5    with?

6            MR. GARDNER:  Your Honor, I'm sorry, could you give

7    me the title again?

8            THE COURT:  Sure.  I have it as ENCL1 -- no, no, I'm

9    sorry -- yep, no, that's it.  ENCL1 search warrant return.

10   That's what the title is to the PDF, and it is a two-page PDF.

11   The front is the warrant signed by Judge Davis out of

12   Alexandria.  The second -- and it refers to two attachments,

13   and then on the other side, it says see attached evidence

14   voucher.

15           MR. GARDNER:  I see, Your Honor.  I believe

16   this would -- I mean, it should -- it should have been

17   associated with the search warrant.  I believe this would be

18   the Infused search warrant.

19           THE COURT:  Okay.  Which one is that?  I mean, of the

20   ones -- have I gone over it with you already?

21           MR. GARDNER:  Your Honor, it --it should be the file

22   labeled 4 1-22-SW.  And then the affidavit in the title as

23   well.  And the affidavit in the title as well.

24           THE COURT:  And what's the attached evidence voucher?

25   Is that the -- what we've gone over as the -- I don't know if I

1   have -- maybe we're getting to it, is the return -- no, we did

2   go over it.

3       So the -- would the evidence voucher be the inventory and

4   the chain of custody that we discussed, or is it something

5   else?

6           **MR. GARDNER:**   Your Honor, I believe that's right.

7   But I -- I can't say right now.

8           **THE COURT:**   Okay.   The next one I have is entitled

9   ENCL2 Peebles search warrant.   It's two pages.   It's another --

10  it looks like a -- signed by Judge Day.   I think we talked

11  about this one earlier.   Maybe not.

12      It's two pages.   It's the -- it's the warrant for

13  Ms. Peebles' residence at Auburn Avenue.   It says see attached

14  inventory list.

15      Which document is the attached inventory list for this?

16  Is it -- I do have something that's labeled Peebles return.   It

17  does appear to have the document, that enclosure two, Peebles

18  search warrant.   It has a copy of that warrant.   Peebles return

19  has a copy of -- same document -- yes, same document at Peebles

20  search warrant -- enclosure two Peebles search warrant appears

21  to be the same document that is at the top of Peebles return.

22      If anybody disagrees with that, let me know.   But that

23  seems to go with the other document we discussed earlier.   I'll

24  put that to the side.

25      Okay.   Next document I have is ENCLA Sal HMA e-mail

1  export, 13 November, 2020, which is a one-page document.

2      What is this exactly?

3          **MR. GARDNER:**  So, Your Honor, this is an e-mail

4  attaching a PST file, which is essentially just a collection of

5  outlook e-mails.  So this would be -- the attachment to this

6  document would have been one of the productions that was made.

7  It's about 120 e-mails that were produced to defense.

8          **THE COURT:**  This is dated 13 November, 2020.  This

9  document, that I'm looking at, Enclosure A, I think I can tell

10  you what it is, but, again, this is getting really, really

11  annoying.  Okay.

12      The document dated -- the document entitled Enclosure A,

13  Sal HMA e-mail export, 13 November, is an e-mail dated

14  November 13.  It's from Sal O'Donnell to Joshua Kimrey.  It

15  appears to be the same date as 2020115 AIR, 111320, which is

16  the report that reference the documents obtained from

17  Ms. Salvator O'Donnell on November 13 by Joshua Kimrey.

18      There is an Enclosure B that's referenced in this report,

19  that seems to be what's marked as Enclosure A.

20      That's as good as I got.  But it is not a defense

21  production, because the case wasn't even indicted at that

22  point.  If it is, we got bigger problems.

23      Enclosures 1 through 10 we talked about.

24      Jackson return is the next document that I have.

25      This appears to be the warrant authorizing the search at

1  Sir Michael Place.  This is a 13-page document which appears to

2  duplicate -- I'm trying to find it -- AIR collection -- well,

3  maybe not.  Let me see.

4       It seems to go with the report, and we talked about this

5  earlier, the AIR collection report for the search warrant

6  executed at Ms. Jackson's house.

7       Okay.  But you got these in an order that makes more

8  sense, defense?  You got these in folders that hopefully put

9  this stuff together for you?

10      Masood -- the next one I have, Masood EMP GEN3 iPad, is a

11  three-page document entitled evidence property custody

12  document, and it seems to reference an iPad.

13      What am I looking at here, government?  There it is.

14           **MR. GARDNER:**  Your Honor, based on the -- just based

15  on the dates of the chain of custody, it looks like it was an

16  iPad that was basically reviewed and then immediately returned.

17  And I wonder if this was, perhaps, aligns with the date of a --

18  that's not right.  I was wondering if it was something that was

19  part of a proffer that was given over for a very short amount

20  of time.  There's only 11 days that it appears to be in

21  government custody, and then it was returned to Mr. Masood, at

22  least according to the dates, so --

23           **THE COURT:**  You see this as -- okay.  First of all,

24  where did this iPad come from?  I can't tell.

25      Second of all, it is the government's position that

```
 1  this -- just so we know, this document reflects returning this
 2  iPad to Mr. Masood.  So that the defense is on notice that
 3  that's the government's position, final disposition, returning
 4  it to Mr. Masood; is that the position?
 5           MR. GARDNER:  Yes, Your Honor.
 6           THE COURT:  This one iPad, am I getting that right?
 7           MR. GARDNER:  Yes, Your Honor.
 8           THE COURT:  Okay.  Now you know, defense.
 9       Next one, Masood EPD.  This one is a different iPad; is
10  that right?  They are referenced in the item number.  Also
11  taken on the same dates, it appears.  And then according to
12  this, returned to Mr. Masood as well.
13       Am I right about that?
14           MR. GARDNER:  Yes, Your Honor.
15           THE COURT:  Okay.  And then --
16           MR. GOROKHOV:  Your Honor, if I may --
17           THE COURT:  Sure.
18           MR. GOROKHOV:  -- while we're clarifying?
19           THE COURT:  Yeah.
20           MR. GOROKHOV:  We're still looking at the Masood EPD
21  document, correct, Your Honor?
22           THE COURT:  So there are -- there's -- let me make
23  sure of this.
24       There's one, two, three relevant documents that I've been
25  given.  Masood EMP GEN3 iPad.  That's what my document,
```

```
 1  three-page document is titled.

 2      Then I have a second one, Masood EPD DM -- D9M16 iPad,

 3  also a three-page document; and then the third, Masood EPD

 4  TBU4G iPad, which appears to be identical to the first

 5  document, the GEN3 iPad, I think.  Because -- and I'm -- I'm

 6  assuming that simply because the -- in the item for each, the

 7  same -- so all three documents are the same kind of form,

 8  evidence property, custody document.

 9      In one and three, in the item column, which is the first

10  column to the left, one and three that I referenced have the

11  same name, it names the iPad as TBU4G-1 iPad.

12      They appear to be identical documents, but I'm not

13  100 percent sure of that, I'm just trying to understand what I

14  got.

15      Then the middle one seems to be for a different iPad.  The

16  title of that one is WRFQ53 iPad.

17          MR. GOROKHOV:  I understand, Your Honor.  Thank you.

18          THE COURT:  Do you have those documents?

19          MR. GOROKHOV:  We do, Your Honor.

20          MR. GOLDMAN:  We do.  I think just for clarity --

21          THE COURT:  Yeah.

22          MR. GOLDMAN:  -- on the record, I think once we get

23  through all of this, maybe just read through what we actually

24  received by document number.

25          THE COURT:  Sure.  Okay.
```

1      **MR. GOLDMAN:**  And that way we'll be able to

2   memorialize -- because I can't keep track -- we can't keep

3   track --

4          **THE COURT:**  I got it.  I'm sorry to have to do it

5   this way, but I'm trying to understand this stuff quickly.

6          **MR. GOLDMAN:**  Thank you.

7          **THE COURT:**  So thank you for you all indulging my

8   questions.

9      I think we're at the end -- I think we're at the end.  The

10  second to the last document that I have is Masood return.

11     The first page -- it's a seven-page document, the first

12  page is the warrant signed by Magistrate Judge Davis, the

13  second appears to be a report listing all of the devices that

14  were taken.  And then the remaining documents appear to be the

15  chain of custody, including the last document -- last two

16  pages, which are similar forms that we just talked about,

17  evidence, property, custody documents.  So that's that.  And

18  then the Peebles return we already discussed.

19     So that's all that I have.

20     Mr. Goldman, you tell me how want to button up the record

21  on what you received, while I try to get my documents in order.

22         **MR. GOLDMAN:**  I think the simplest thing would be

23  just if I list each of the folders, and then the contents of

24  that folder by document name and number of pages of that

25  document.  I'm not going to reference any of the enclosures or

1  anything.  I don't want to get into the content of it, because

2  I think that's going to be just far more complicated than what

3  we can do right now.

4         **THE COURT:**  Sure.

5         **MR. GOLDMAN:**  If I can just memorialize what's

6  actually in the folders.

7         **THE COURT:**  Okay.

8         **MR. GOLDMAN:**  The first folder we have is Case, it

9  contains three documents.  The first is AIR warrant Case

10  HCS6APR22.

11         **THE COURT:**  Uh-huh.

12         **MR. GOLDMAN:**  That is a two-page document.

13     The second is Case HCS return.  That is a three-page

14  document.

15         **THE COURT:**  Uh-huh.

16         **MR. GOLDMAN:**  The third is ENCL1 search warrant

17  return.  That is a two-page document.

18         **THE COURT:**  Uh-huh.

19         **MR. GOLDMAN:**  The next folder is titled collection of

20  HMA e-mails.  That contains two documents.  The first is

21  labeled 20201115 AIR 0009-19-CID192 REC of docs, paren,

22  O'Donnell.  That is a one-page document.

23         **THE COURT:**  Okay.

24         **MR. GOLDMAN:**  The next is labeled ENCLA Sal HMA

25  e-mail export 13 November 2020.PST.  That is a one-page

1    document.

2              **THE COURT:**  And that's in the same folder, the second

3    folder?

4              **MR. GOLDMAN:**  That's all in that second folder, yes,

5    Your Honor, the collection of HMA e-mails folder.

6         The third folder we have is labeled collection of Infused

7    e-mails.  It has two documents.  The first is 20200302-AIR,

8    collection of evidence, paren, e-mails.  That is a one-page

9    document.

10        The next is labeled data extraction report 13-20.  That is

11   a two-page report.

12        That is the end of the third folder.

13             **THE COURT:**  And the third folder was labeled?

14             **MR. GOLDMAN:**  Collection of Infused e-mails.

15             **THE COURT:**  Infused e-mails?

16             **MR. GOLDMAN:**  Yep.

17        Then we have a folder labeled Jackson.

18             **THE COURT:**  Okay.

19             **MR. GOLDMAN:**  That contains three documents, the

20   first of which is labeled AIR collection at Jackson residence,

21   06 April '22.  That is a one-page document.

22        We then have a document labeled Enclosures 1 through 10.

23   That is a 11-page document.

24             **THE COURT:**  Yep.

25             **MR. GOLDMAN:**  Then we have a document labeled Jackson

1    return.  That's a 13-page document.

2              **THE COURT:**  Okay.

3              **MR. GOLDMAN:**  The next folder is labeled Masood.

4    That contains -- one, two, three, four -- five documents.  The

5    first is labeled AIR collection at Masood residence-06

6    April '22, with attachments.  That is one-page document.

7         The next is labeled Masood EMP, paren, GEN3 iPad.  That is

8    a three-page document.

9         The next is labeled Masood EPD, paren, D9M16 iPad.  That

10   is a three-page document.

11        The next is labeled Masood EPD, paren, TBU4G iPad.  That

12   is a three-page document.

13        And the last in that folder is labeled Masood return, that

14   is a seven-page document.

15             **THE COURT:**  Okay.

16             **MR. GOLDMAN:**  And then in the last folder is labeled

17   Peebles.  This is four documents, the first of which is AIR

18   search arrest of Peebles, 6 April '22.  That is a two-page

19   document.

20        Followed by enclosure one, Peebles arrest warrant.  That's

21   a one-page document.

22        Followed by enclosure two, Peebles search warrant, a

23   two-page document.

24        And, finally, with Peebles return, a five-page document.

25   And that is what we received in a folder labeled chains of

 1   custody at 9:07 p.m. last night uploaded to USAfx.

 2           **THE COURT:**  Okay.  All right.  Great.  It seems like

 3   we have the same thing, just in different order.

 4       All right.  I want to -- again, I've got some questions

 5   about the letter, and then we'll figure out where we go.

 6       Mr. Goldman, do you have anything?

 7           **MR. GOLDMAN:**  I would just like for the record to

 8   reflect that I can't confirm that we have all the same things

 9   based on that, but I --

10           **THE COURT:**  I think we do, but we're going to get

11   into the details of it anyway, so let me know if you disagree

12   at any point.

13           **MR. GOLDMAN:**  Thank you.

14           **THE COURT:**  Okay.  So the government at ECF 247

15   responded to some of the motions that are outstanding.  The

16   first is ECF 241.

17       The first thing that the government says that I want to

18   get some clarity on, is at the third paragraph of this letter,

19   it says a filter team was established led by an AUSA in the

20   Baltimore office of the U.S. Attorney's Office for the District

21   of Maryland.

22       Who is that AUSA?

23           **MR. GARDNER:**  Your Honor, AUSA Michael Phelps -- or

24   I'm sorry, Matthew Phelps, Your Honor.

25           **THE COURT:**  Matthew Phelps.  Is he the only AUSA?

29

1              MR. GARDNER:  Yes, Your Honor.

2              THE COURT:  And then it says on June 23rd, a filter

3    team established consisting of a representative from Navy, Army

4    and DCIS.

5         Who is that?

6              MR. GARDNER:  Your Honor, I will get those names for

7    you.

8              THE COURT:  How do you know -- what's the source of

9    this information?  How did you learn this last night?

10             MR. GARDNER:  There is an e-mail with those names on

11   it, Your Honor.

12             THE COURT:  And I'm asking for the e-mail -- I'm

13   asking -- here's the problem that you have.  You know this,

14   right?  You know what's coming?

15             MR. GARDNER:  Yes, Your Honor.

16             THE COURT:  What I'm going to ask.

17        You tell the government in an e-mail something completely

18   contrary, you tell the Court something completely contrary.  It

19   is a critical issue, because so many of the delays have been

20   attributable to this filter team.

21        Now we learn something different.

22        As an officer of the court, getting this right for defense

23   counsel is extremely important because getting it wrong

24   misleads them; likewise, with the Court.

25        So you know you have to come in today and tell me more

1   than what's in a vague letter.

2            **MR. GARDNER:**  Understood, Your Honor.

3            **THE COURT:**  So I need to know who it is, and I need

4   to know it now, and if it's an e-mail, I need to know the

5   authority -- the authors of the e-mail.  So when you get it,

6   let me know.  Okay?

7         The significant amount of time that the Army CID cyber

8   team attempted to crack the passwords, but eventually, Mr. --

9   AUSA was able to get the passwords.

10        When did he get the passwords?  Because it had to have

11  been between June and August, because according to your letter,

12  by August 21, at least one defendant declined to waive

13  privilege, which means you got in it, right?  And you needed to

14  know whether you could search with or without a taint team; am

15  I right?

16            **MR. GARDNER:**  Yes, Your Honor.  And I don't have that

17  exact date for you, but it is obviously between those two

18  dates, Your Honor.

19            **THE COURT:**  Okay.  All right.  Then it says the

20  files -- so on August 21, 2022, at least one defendant declined

21  to waive privilege.

22        The files from each defendant's devices were returned to

23  their respective owners, parens, discovery one.

24        What does that mean?

25            **MR. GARDNER:**  So, Your Honor, after the devices were

1  basically -- this was just the return of the devices.  So

2  discovery one is -- was an individualized return of the

3  physical devices to each defendant.

4        **THE COURT:**  Discovery one, what is discovery one?

5        **MR. GARDNER:**  It's just how we're labeling the actual

6  return of the physical devices.  So -- within the discovery one

7  folder, it would just say, you know, physically returned to

8  owners.

9        **THE COURT:**  What's discovery one?  Is there a folder

10  that you have, defense, named discovery one, that was produced

11  by the government?

12        **MR. GOLDMAN:**  There is a discovery letter --

13        **THE COURT:**  Okay.

14        **MR. GOLDMAN:**  -- entitled discovery one that

15  references one cell phone for Mr. Masood, if I recall

16  correctly.

17        **THE COURT:**  Okay.  That's part of what I'm getting at

18  here.

19     So first of all, this sentence says the files from each of

20  the devices, not the devices.

21     Yesterday, you -- in fact, you were clear, and you

22  corrected me.  At one point, you actually interrupted, and it

23  was okay, because you needed to correct it, and appreciated it.

24  But you were clear that the devices were returned.

25     This, I get this morning, and it says the files from each

```
 1   of the devices were returned.

 2        So what's -- what's going on here?

 3             MR. GARDNER:  One moment, Your Honor.  I'm going to

 4   pull up the letter and see if it specifies.

 5             THE COURT:  And while you're doing that, that reminds

 6   me.  I asked in the beginning of our call yesterday, and this

 7   is just for clarity of record, if there was anyone else on the

 8   line with either party.  At some point, I heard a woman answer

 9   a question for the government.  Who else was in the room with

10   you?

11             MR. GARDNER:  Your Honor, that would be agent Sonia

12   Smith.

13             THE COURT:  Who?

14             MR. GARDNER:  Agent Sonia Smith.

15             THE COURT:  Who is she?  What agency is she with?

16             MR. GARDNER:  I believe she's with DOD CID.

17             THE COURT:  Okay.  Was she with you the entire time

18   of our call?

19             MR. GARDNER:  No, Your Honor.

20             THE COURT:  When did she come?  In an hour-long

21   conversation, roughly?  Because I do want the record to be

22   clear as to who -- who participated in that call yesterday.

23             MR. GARDNER:  Your Honor, she was there for about

24   15 minutes.

25             THE COURT:  Into the call she came?
```

1          MR. GARDNER:  No, Your Honor.  She was there at the

2   beginning of the call.

3          THE COURT:  I'm sorry, when was she there?

4          MR. GARDNER:  She was there at the beginning of the

5   call, Your Honor.

6          THE COURT:  When I asked if anybody else was in the

7   room?

8          MR. GARDNER:  Yes, Your Honor.

9          THE COURT:  And she was there -- I think she was

10  there for more than 15 minutes, because I recall it was well

11  into the conversation that I heard a woman's voice.  I can go

12  back.  I mean, the tape doesn't lie, but -- Sonia Smith is the

13  agent that was with you?

14         MR. GARDNER:  Yes, Your Honor.

15         THE COURT:  Anybody else?

16         MR. GARDNER:  Yes, Your Honor.

17         THE COURT:  Who else?

18         MR. GARDNER:  Agent Joshua Kimrey was in the room as

19  well, Your Honor.

20         THE COURT:  He was?

21         MR. GARDNER:  Yes, Your Honor.

22         THE COURT:  So there were two people in the room when

23  I asked if anybody else was in the room with you?

24         MR. GARDNER:  Yes, Your Honor.

25         THE COURT:  One of whom is the case agent, right?

1          **MR. GARDNER:**  Yes, Your Honor.

2          **THE COURT:**  Who is the affiant on a number of these

3   documents, right?

4          **MR. GARDNER:**  Yes, Your Honor.

5          **THE COURT:**  And the custodian on a number of these

6   devices that you say were returned at some point to the

7   defendants?  Just so I'm clear.

8          **MR. GARDNER:**  Yes, Your Honor.

9          **THE COURT:**  Anybody else?

10         **MR. GARDNER:**  No, Your Honor.

11         **THE COURT:**  Defense?  Mr. Gorokhov, was it you?

12   Mr. Goldman, who else was in the room?  Anybody else?

13         **MR. GOROKHOV:**  Your Honor, I was in the room by

14   myself.  And Mr. Goldman I can't speak for, he was in

15   Alexandria.

16         **MR. GOLDMAN:**  I was in my office by myself with the

17   door closed, Your Honor.

18         **THE COURT:**  Okay.  Thank you.

19      So what's meant by the files from each defendants' devices

20   were returned to their respective owners?

21         **MR. GOLDMAN:**  Your Honor, if I might just correct

22   that, I did have a paralegal who came in and delivered a note

23   during that but, she just dropped it on my desk and left.

24         **THE COURT:**  And kept going?

25         **MR. GOLDMAN:**  And kept going.

1          **THE COURT:**  Thank you.

2          **MR. GARDNER:**  Your Honor, I -- I believe based on all

3     the other records of devices being returned at a much later

4     date, this would have been -- and knowing the process of the

5     filter team, and when that came about, I believe this was the

6     return of a physical device, and that there were files --

7          **THE COURT:**  Okay.  So hold on.  You're the author of

8     this letter, right?

9          **MR. GARDNER:**  Yes, Your Honor.

10         **THE COURT:**  You're sitting at your computer last

11    night.  It was not 12 hours ago, 13.  When you wrote the word

12    the "files" from each defendants' devices, what did you mean by

13    the word "files" from each of the devices?  You're now telling

14    me it's the device.  What were you -- what were you looking at?

15    What were you thinking about?  This is important.

16         **MR. GARDNER:**  Your Honor, the truth is, I don't know

17    whether it was the files or the actual phone itself, and I can

18    find that information out, but --

19         **THE COURT:**  Then why write it?  Why write it when you

20    insisted to me on the phone it was devices, why write this?

21    What were you trying to demonstrate to me?

22         **MR. GARDNER:**  Your Honor, at the time, I probably

23    thought it was the most inclusive, that it would capture

24    basically that the information on the devices was returned.

25    I -- I think it was probably out of an abundance of caution,

1  not knowing which one.  But, I mean, the file captures both.

2         **THE COURT:**  Here's what you do when you don't know.

3  You say I don't know.

4         **MR. GARDNER:**  Understood, Your Honor.

5         **THE COURT:**  You don't misrepresent.  Because at some

6  point, you add up errors, and it looks, at a minimum, reckless.

7  And that's a problem in this case.  So because I'm thinking

8  that you're clarifying something from yesterday in this

9  incredibly important issue.  Because by my count, I could be

10  overstating it, but I want to say there's probably, among the

11  three, four locations hit, what, 20 devices, maybe more?

12         **MR. GOROKHOV:**  27, Your Honor.

13         **THE COURT:**  27.

14     So what we've -- what I'm going to take away from this

15  conversation about this sentence is it adds zero to the query

16  about what happened to these devices where, and is of concern

17  because I need to be able to, frankly, rely on your

18  representations.  And this is very problematic.

19     Okay.  Next -- next -- next line, "The devices were

20  eventually successfully imaged and uploaded to Relativity."

21     Relativity is a database that was accessed only by the

22  government or by defense as well?

23         **MR. GARDNER:**  I'm sorry, Your Honor, you're on the

24  bottom of page -- top of Page 2?

25         **THE COURT:**  Top of Page 2.  Devices were eventually

1   successfully imaged and uploaded to Relativity.

2            **MR. GARDNER:**  Yes, Your Honor.

3            **THE COURT:**  I understand Relativity to be a database?

4            **MR. GARDNER:**  Yes, Your Honor.

5            **THE COURT:**  Who had access to that database?

6            **MR. GARDNER:**  Initially -- I will not speculate, but

7   Michael Phelps -- I'm sorry, Matthew Phelps certainly had

8   access.

9            **THE COURT:**  The taint team did?

10            **MR. GARDNER:**  And I believe the taint team, right.

11   The three individuals whose names I --

12            **THE COURT:**  Taint team.  That's it, right?

13            **MR. GARDNER:**  -- have now, Your Honor.

14            **THE COURT:**  Yep.  Okay.

15      But the defense was never given what was uploaded?

16            **MR. GARDNER:**  Correct.

17            **THE COURT:**  Okay.  All right.  So the taint team

18   review began and was completed November of 2023.  When did the

19   taint team begin its review?

20            **MR. GARDNER:**  Your Honor, there was a filter team

21   memo dated July 25th, 2022, basically laying out for the taint

22   team how they should review those documents.

23            **THE COURT:**  Okay.  When did it begin?

24      While Mr. Manthripragada is looking for that, tell me the

25   source of the information for the review was completed on

1  November 2023.

2          **MR. GARDNER:**  Your Honor, that -- that was based on

3  e-mail traffic that I was able to find relating to this case.

4          **THE COURT:**  Between the team and Mr. Ake?

5          **MR. GARDNER:**  Yes, Your Honor.

6          **THE COURT:**  All right.  I still want to know when it

7  started.

8      But moving on, counsel for the government, Adam Ake

9  reviewed the documents and determined there was no *Brady*

10 material and concluded that none of the material would be used

11 in the prosecution.

12     Okay.  If I'm getting it right, what you're representing

13 to me is that the 27 devices at issue were imaged and uploaded

14 to Relativity; is that correct?

15         **MR. GARDNER:**  Yes, Your Honor.

16         **THE COURT:**  And you're also representing to me that

17 Mr. Ake personally reviewed the contents of all 27 devices to

18 determine if *Brady* material existed?

19         **MR. GARDNER:**  Yes, Your Honor.

20         **THE COURT:**  Can you give me the terabytes on the 27

21 devices and when Mr. Ake himself reviewed for *Brady*?

22         **MR. GARDNER:**  So, Your Honor, the -- I don't have the

23 number of -- I mean, what Mr. Ake reviewed on Relativity was

24 basically an extraction of the documents on those devices.  So

25 there was initially, you know -- so, Your Honor, I have a bit

1    more of a -- a better timeline to answer your questions.

2            **THE COURT:**  Okay.

3            **MR. GARDNER:**  There were initially, it looks like,

4    500,000 objects in the database, and that could be photos,

5    PDFs, executable files.  Basically everything that would on the

6    device.

7            **THE COURT:**  500,000 objects; is that what you said?

8            **MR. GARDNER:**  Yes, Your Honor.

9            **THE COURT:**  Half million objects.  Okay.  Got it.

10           **MR. GARDNER:**  So then search terms were run against

11   those objects.

12           **THE COURT:**  Okay.

13           **MR. GARDNER:**  And 34,000 hits were made based on the

14   search terms that were run against those objects.

15           **THE COURT:**  That was by the taint team, is that what

16   you're saying, Mr. Phelps and the agents?

17           **MR. GARDNER:**  Yes, Your Honor.

18           **THE COURT:**  Okay.

19           **MR. GARDNER:**  After that, that same search based on

20   the keywords was conducted, minus the words privilege and

21   legal.  So basically, a further filter was done to take out

22   potentially privileged information.

23           **THE COURT:**  Okay.  On the further search was done on

24   the smaller --

25           **MR. GARDNER:**  Yes, Your Honor.

40

1          **THE COURT:**  -- subset, the 34,000; is that what you

2    said?

3          **MR. GARDNER:**  Yes.

4          **THE COURT:**  Okay.

5          **MR. GARDNER:**  Of that smaller subset, on

6    November 16th, 2023, AUSA Matt Phelps basically told AUSA Ake

7    that he could review that -- that that subset was ready for his

8    review.

9          **THE COURT:**  The subset of -- wait a minute.

10    I thought you said the subset were the presumptively

11    privileged documents?

12          **MR. GARDNER:**  I'm sorry.  That was minus.

13    So of the -- of the 34,000 remaining, remaining of those,

14    after filtering out for, you know, keywords that would indicate

15    privilege, or privilege or legal keywords, there were 6,258

16    documents remaining in that database.

17          **THE COURT:**  Hold on.  So there's 500,000 objects?

18          **MR. GARDNER:**  Yes, Your Honor.

19          **THE COURT:**  How many were privileged, presumptively?

20          **MR. GARDNER:**  So, Your Honor, of -- of the amounts

21    that hit on his search terms --

22          **THE COURT:**  Which were for privilege?

23          **MR. GARDNER:**  Your Honor, this is coming from the

24    privilege team.

25          **THE COURT:**  Okay.  What does it say?

1          **MR. GARDNER:**  It says there are 5,000 -- roughly

2  5,000 objects in the Relatively database.

3          **THE COURT:**  5,000 -- wait.  Hold on.  5,000 or

4  500,000?

5          **MR. GARDNER:**  I'm sorry.  500,000, Your Honor.

6          **THE COURT:**  500,000.

7          **MR. GARDNER:**  And your search terms, 44 of them, so

8  it was 44 search terms were given, hit on 34,425 of them.

9          **THE COURT:**  Okay.  So 34,000 had hits, based on the

10  search terms that the taint team used to call out privileged

11  documents, right?  Am I right?

12          **MR. GARDNER:**  Potential privilege, Your Honor.

13          **THE COURT:**  Right.

14          **MR. GARDNER:**  I've seen a list of terms, and it

15  includes various names.

16          **THE COURT:**  Lawyers and --

17          **MR. GARDNER:**  Attorneys and various other terms like,

18  you know, privilege, esquire, that sort of thing.

19          **THE COURT:**  Right.  So that leaves over 400,000 -- I

20  didn't go to law school because I'm good at math.  Over 400,000

21  objects that were not privileged.

22      Okay.  What's the next step?

23          **MR. GARDNER:**  Your Honor, the way this e-mail -- the

24  way this e-mail reads, it has to be that search terms were

25  provided.  And of those, only 34,000 were hits, and those were

 1   the documents that were then subjected to a privilege review.

 2           **THE COURT:**  Correct.

 3           **MR. GARDNER:**  Okay.

 4           **THE COURT:**  And that's done by the taint team?

 5           **MR. GARDNER:**  Right.

 6           **THE COURT:**  Okay.  Got you.  And then what happened?

 7           **MR. GARDNER:**  And then it was further filtered, so it

 8   looks like they subtracted the words privilege and legal.

 9           **THE COURT:**  From the 34,000?

10           **MR. GARDNER:**  From the 34,000, yes, Your Honor.

11           **THE COURT:**  And then what happened?

12           **MR. GARDNER:**  Now there were 6,258 items remaining.

13           **THE COURT:**  In the -- from the 34,000, once you

14   subtract out those --

15           **MR. GARDNER:**  Yes, Your Honor.

16           **THE COURT:**  -- there were 6,000 left?

17           **MR. GARDNER:**  Yes.

18           **THE COURT:**  And then what happened with those?

19           **MR. GARDNER:**  Those documents, at that point, Adam

20   Ake -- or AUSA Ake was given access to that Relativity database

21   and presumably started to review those documents.

22           **THE COURT:**  Presumably.

23      What do you know about the review that was conducted in

24   the now 400-plus thousand objects for *Brady*?

25           **MR. GARDNER:**  Your Honor, I don't believe the 400,000

1  objects were reviewed for *Brady*.

2          **THE COURT:**  Right.  That's what your letter suggests.

3  Your letter basically tells me that Adam Ake reviewed the

4  documents and determined there was no *Brady* material and

5  concluded that none would be used in the prosecution.  That's

6  clear.  You've -- you're walking away from all of it.

7          What I'm concerned about is you told me in a letter

8  Mr. Ake reviewed these documents that were uploaded into

9  Relativity for privilege.  What did he do as an officer of the

10 court?  If you do not know, say you do not know.  But do not

11 get out on a limb and tell me something you're not really

12 comfortable with when it comes to *Brady*.

13         **MR. GARDNER:**  Your Honor, I -- I understand how this

14 reads, and it could be read a couple of different ways.

15         I think what I was trying to convey to the Court, and

16 obviously I wasn't successful, was that of the documents that

17 were made available to Adam Ake after this review, he reviewed

18 those --

19         **THE COURT:**  Okay.  I'm going to read this paragraph

20 into the record, because this isn't my reading, these are your

21 words.

22         **MR. GARDNER:**  Yes, Your Honor.

23         **THE COURT:**  "The devices were eventually successfully

24 imaged and uploaded to Relativity where a taint team review

25 began and was completed on November 20, 2023.  Counsel for the

government, Adam Ake, reviewed the documents and determined

there was no *Brady* material and concluded that none of the

material would be used in the prosecution."

Weren't you prepared to argue to me today, if I didn't

drill down on this, that there is no *Brady* violation?  As a

matter of fact, this is in response to ECF 241, where there's

no *Brady* violation because we did the review, right?  Isn't

that what you're going to tell me?

MR. GARDNER:  Your Honor, this -- this paragraph and

the one before it were, frankly, to inform the Court about why

we had made incorrect statements on the call.  So I was -- I

was trying to give as much detail as I knew the chronology that

happened.

THE COURT:  I understand that.  That's a separate

problem.

But the problem I'm having right now is in this letter,

this is why I'm drilling down on it, because frankly it sort of

blinks at reality, that one very busy AUSA could go through 27

devices.  So if you really did a *Brady* review, there would be

more, and it's not here.

MR. GARDNER:  Your Honor, the word "remaining" was

obviously omitted.  I think I intended to put that in, but --

THE COURT:  Okay.  So let's go there.

There's a *Brady* review of 6,000 documents according to

Mr. Ake.  How about the rest of them?  Anyone review them for

1    *Brady*?

2              **MR. GARDNER:**  I -- we can't represent that anything

3    was reviewed for *Brady* apart from those documents, Your Honor.

4              **THE COURT:**  All right.  So for purposes of today, the

5    answer is no.

6              **MR. GARDNER:**  Yes, Your Honor.

7              **THE COURT:**  Okay.  So we've got 27 devices seized,

8    uploaded clearly from the three main players in this trial

9    coming up.  Am I wrong?

10             **MR. GARDNER:**  No, Your Honor.

11             **THE COURT:**  Peebles, Jackson, and Masood?

12             **MR. GARDNER:**  That's correct.

13             **THE COURT:**  And there has been no *Brady* review that

14   you can give me today, right?

15             **MR. GARDNER:**  No, Your Honor, not a complete review

16   of all of those devices.

17             **THE COURT:**  You talked to Mr. Ake last night, right?

18             **MR. GARDNER:**  Yes, Your Honor.

19             **THE COURT:**  He gave you whatever he knew?

20             **MR. GARDNER:**  Yes, Your Honor.

21             **THE COURT:**  What are we doing?  What are we doing?

22   How could I possibly allow a trial to go forward given that

23   the -- the state of this record?

24             **MR. GARDNER:**  Your Honor, this is -- maybe not answer

25   your question, but we immediately took steps to get those

1  remaining documents, basically the entire universe of documents

2  into a format where defense could review them.  So there are

3  steps to rectify it.  But I agree with Your Honor, it is an

4  issue.

5            **THE COURT:**  Okay.  Let's -- let's talk a little bit

6  more.

7       So we're -- we're in agreement that there's 400-plus

8  thousand objects that were uploaded from the devices that were

9  seized in April of 2022 that were reviewed by the taint team,

10 and 34,000 were accepted out.  I'm still waiting for -- do you

11 have a date for me as to when that first cut happened?  That

12 when the 34,000 were set aside as potentially privileged?

13           **MR. GARDNER:**  Your Honor?

14           **THE COURT:**  Yeah.

15           **MR. GARDNER:**  On November 20, 2023, is when AUSA Ake

16 added -- asked to be added to the database, and it was

17 confirmed that he was added to the database on that date.

18           **THE COURT:**  I didn't ask that.

19      I want to know when the 34,000 was culled out as

20 presumptively privileged.

21           **MR. GARDNER:**  Your Honor, I don't have an e-mail

22 record of when it was actually completed.

23           **THE COURT:**  When was the -- okay.

24      These are the dates that I want, and I want them today,

25 like before this hearing ends.  I want to know when the taint

```
 1   team started.  I want to know when the first 34,000 documents
 2   were extracted.
 3            MR. GARDNER:  Okay.
 4            THE COURT:  Okay?
 5            MR. GARDNER:  Your Honor, the answer to your second
 6   question would be November 16th, 2023.
 7            THE COURT:  Was when?
 8            MR. GARDNER:  When the 34,000 documents were
 9   extracted.
10            THE COURT:  Okay.  So we got November 16, 2023, is
11   when they were extracted, and then November 20 is when it was
12   completed; is that right?
13            MR. GARDNER:  Yes, Your Honor, when the access was
14   granted to Relativity.
15            THE COURT:  To Mr. Ake?
16            MR. GARDNER:  Yes, Your Honor.
17            THE COURT:  And any further detail about what Mr. Ake
18   did or didn't do that you haven't already told me about?
19            MR. GARDNER:  There was another e-mail that I'm going
20   to try to find, Your Honor.  I think there's one more date.
21   I'm just trying to get you all the dates you have -- we can.
22            THE COURT:  One more date for what?
23            MR. GARDNER:  Your Honor, I was looking for whether
24   there was an update from Mr. Ake, as he forwarded me a few
25   e-mails last night, about when things had happened.  But
```

1    there's no dates on those, just a representation of what was

2    done.

3              THE COURT:  You mean when Mr. Ake communicated with

4    you last night?

5              MR. GARDNER:  Yes, Your Honor.

6              THE COURT:  Okay.  And we -- we don't know when the

7    taint team began yet; is that right?

8              MR. GARDNER:  The exact date, no, Your Honor.  We

9    just have the -- we have the taint review memo.

10             THE COURT:  And the date on that is when?

11             MR. GARDNER:  The date on that is July 25th, 2022,

12   Your Honor.

13             THE COURT:  Do we have any -- any additional

14   information as to why it took nearly 15 months to get this

15   done?

16             MR. GARDNER:  I do have anecdotal information about

17   why this took so long, but I'm happy to tell what I know.

18             THE COURT:  Okay.  And I'll accept it as that.  Go

19   ahead.

20             MR. GARDNER:  So, Your Honor, as I understand what

21   happened, there was obviously some delay getting into the

22   phones.  And then everything had to be sort of sent to other

23   locations to be -- to be imaged.  So a lot of the delay was in

24   moving things down to, I believe, Quantico, where a lot of the

25   images were -- where the devices were imaged.  And then

1  creating a copy, doing -- having another team basically pull

2  out all of the operating system files and windowing it down,

3  and then once that happened, each -- it was a different team

4  doing each one.  So that was some of the delay.

5      And then finally we get it in a format that we can upload

6  to Relativity and start to process.

7          **THE COURT:**  Okay.  All right.  I want to leave the

8  rest of the motions alone right now, and let's talk about where

9  we are.

10     I still don't have a lot of clarity as to what, if

11 anything, from these 27 devices were ever produced to the

12 defense.

13     Has there been anything from those devices produced to the

14 defense?

15     And presumptively you would have gathered the discovery

16 letters from your predecessors last night, reviewed them to

17 confirm, since it would behoove the government to come in to

18 say, oh, no, the defense has it all wrong.  We gave this to

19 prior counsel, it's their fault.

20         **MR. GARDNER:**  Your Honor, this Relativity database,

21 and what was the collection of the images from all the devices

22 was never given to the defense.

23         **THE COURT:**  Okay.  Mr. --

24         **MR. GARDNER:**  I do think that there was an awareness

25 that it existed.  But, again, it is our affirmative obligation,

1    of course, to produce it.  I think defense counsel all knew it

2    existed, maybe wasn't interested in it, that's what I

3    understand to be the case.

4         **THE COURT:**  Hold on.  Hold on.  That's my question.

5         Defense, I would imagine that your predecessor counsel

6    made discovery requests, issued a discovery letter for Rule 16?

7         **MR. GOROKHOV:**  Your Honor, what -- what I can say is

8    that he asked for -- I do not believe he issued a Rule 16

9    letter.

10        **THE COURT:**  Okay.

11        **MR. GOROKHOV:**  However, he did state, on at least two

12   and possibly more conferences with the Court, that they

13   definitely wanted this material.  It's memorialized in the

14   file.  I can represent -- technically, it's privileged -- the

15   communications are privileged, because they are between prior

16   counsel and Mr. Masood.  But I can represent to Your Honor that

17   he clearly stated that they wanted the devices, and eventually

18   that became memorialized in the Court's --

19        **THE COURT:**  You might want to contact predecessor

20   counsel to get any proof that they've asked the government for

21   those.  Do you see what I'm saying?  You made the discovery

22   request.

23        **MR. GOROKHOV:**  Yes.

24        **THE COURT:**  Because --

25        **MR. GOROKHOV:**  I understand, Your Honor.  But what

1   I'm saying --

2           **THE COURT:**  Right.  Go ahead.

3           **MR. GOROKHOV:**  What I'm saying is, we know he made

4   the requests, because when the Court held conference calls, he

5   made the requests, he documented it.  He made the request

6   orally.  It doesn't have to be in any particular form.

7       They repeatedly told the government that these devices

8   were important, and they did not want to proceed.

9       When Mr. Ake said, we can go to trial without the devices,

10  they said, no, no, no.  We're not going to do that.

11      And it's in the Court's orders.  That language is in

12  multiple orders.  I believe it's in four separate orders of the

13  Court that memorializes -- for example, there's a 10/26/22 and

14  a 11/22/22, those were the status calls in which it came up,

15  and then it later became memorialized on the record that

16  counsel wants this, and the government is working to provide it

17  to them expeditiously.

18          **THE COURT:**  Yes, the letter -- you're refreshing my

19  recollection.  The August 9, 2022, letter, I believe that was

20  the one that was issued by Ms. Kelly?

21          **MR. GOROKHOV:**  That's correct.

22          **THE COURT:**  It was on behalf of all defendants --

23          **MR. GOROKHOV:**  That's correct.

24          **THE COURT:**  -- who had interest in it.  I remember

25  seeing Mr. Masood's name.

1          **MR. GOROKHOV:**  Yes, Your Honor.

2          **THE COURT:**  And that letter did specifically say, we

3    told the Court at the last status conference, quote, multiple

4    computers and devices seized from the defendants on their dates

5    of arrest had not yet been searched or produced, and they are

6    awaiting the results of search warrants for Google and for

7    certain e-mails, and they couldn't, in good conscience, walk

8    away from the -- any sort of speedy trial violation.

9       But I remember Ms. Kelly saying this to me, that it was

10   important to all the defendants because without it, they

11   couldn't adequately prepare for trial.

12      And she basically spoke for everyone on the call.

13         **MR. GOROKHOV:**  And if I may, Your Honor, just confer

14   with my colleagues for just one second.

15         **THE COURT:**  Sure, of course.

16         **MR. GOROKHOV:**  Because I think that --

17         **THE COURT:**  I want to look at this letter again.

18         **MR. GOROKHOV:**  Your Honor, we do have -- I believe

19   there's a total of four documents containing this, but, for

20   example -- Your Honor, if you give me just one second, I'll

21   read into the record what's in the docket also.

22         **THE COURT:**  Sure.  I'm rereading ECF 94 now.  And

23   you're correct, that it does memorialize on behalf of

24   defendants Jackson, Peebles, and Masood, Duncan, Williams,

25   Titi, Russ, and Paul.

1           **MR. GOROKHOV:**  So, Your Honor, reading from document

2  ECF 110 --

3           **THE COURT:**  Yeah.

4           **MR. GOROKHOV:**  -- at Paragraph 4, and I believe

5  there's four such orders, but it says on August 9th, counsel

6  for defendants and government related delays in providing

7  discovery materials discussed above due to issues arising from

8  security features the defendants ultimately helped resolve by

9  voluntarily providing passwords.

10     Although counsel for the defendants expressed frustration

11  with the pace of discovery production, which the Court

12  acknowledged, none wishes to forego receipt of the additional

13  materials, which the government represented would be provided

14  as expeditiously as possible.

15           **THE COURT:**  Yeah.  Okay.  There's -- there's not a

16  lot of controversy that you asked for it.  So this is what

17  we've got.

18     We got three -- we got the defendant and two codefendants

19  who are on your witness list who make up, I'm sure, the lion's

20  share, if not all of the 27 devices.

21     The discovery request was made.  I haven't heard any

22  proffer that any of this discovery was produced.

23     So that's a Rule 16 violation, right?

24           **MR. GARDNER:**  Yes, Your Honor.

25           **THE COURT:**  Okay.  One of the sanctions can be that

1    you're not permitted to call those witnesses.  I think that's

2    a -- I want you to think about it.  I'm going to take a break,

3    because I think we all need a break.  But I really want you all

4    to think about that.

5        I think that's an absolutely fair sanction for not

6    providing 500,000 objects, 400-plus thousand are not

7    privileged.  You could have done it in November.  Didn't.  Nine

8    months later, we're on the eve of trial without explanation.  I

9    have no idea why you didn't do it.

10       So why don't we start with discussing what is now admitted

11   by the government to be a Rule 16 violation and near certainly

12   a *Brady* violation.  I don't see anything to the contrary of

13   why, at a minimum, on the Rule 16 issue, I'm just striking

14   whatever witness is -- is associated with these devices.  So

15   that means no Ms. Peebles and no Ms. Jackson.

16       I mean, the government -- the defense hasn't even talked

17   yet about what sanctions they want for this.  But I'm just

18   talking about what is fair, like what is just.  You don't give

19   over the devices that was seized from two of the people closest

20   to this alleged conspiracy, the conspirators.

21       Anyway, think about it.  Think about where we go from

22   here.  But I think I have to give my good people a break, and I

23   need one.  So let's take 15.  Okay?

24           **DEPUTY CLERK:**  All rise.  This Honorable Court now

25   stands in recess.

1    (Recess taken at 10:52 a.m. until 11:13 a.m.)

2        **DEPUTY CLERK:**  All rise.  This Honorable Court now

3   resumes in session.

4        **THE COURT:**  All right.  Counsel, are we ready to

5   continue?                                            .

6            (ALL COUNSEL:  Yes, Your Honor.)

7        **THE COURT:**  Okay.  I have a few more questions, or

8   unless you have anything you want to put on the record before I

9   ask some of my questions?

10        **MR. GARDNER:**  No, Your Honor.

11        **MR. GOROKHOV:**  No, Your Honor.  Thank you.

12        **THE COURT:**  Okay.  Government, let's just try to cut

13   to the chase.  Can you tell me of the 27 devices, which, if

14   any, were returned?  The devices, the actual, physical iPad,

15   phone, laptop?

16        **MR. GARDNER:**  Your Honor, it is -- it is my

17   understanding, from conversations with the case agent, that

18   every device in this case is returned and only images were

19   kept.  I don't believe there are any physical devices left in

20   any government repository of any sort.  And that's based on

21   representations from the case agent.

22        **THE COURT:**  Okay.  But -- so in -- in that regard,

23   you do recognize that none of the chain of custody -- maybe the

24   three involving the two iPads for Mr. Masood, maybe, reflect

25   that they were returned to him.  And I saw another chain of

1  custody to suggest that Ms. Masood got a printer back.  But

2  other than that, there's no confirmation in the chain of

3  custody that the devices were returned.

4       MR. GARDNER:  Your Honor, I don't know that

5  there's -- well, I think that's right, Your Honor, and I can't

6  say where those chain of custody documents would prove it.  I

7  think we can certainly review our documents and get there.

8  Speaking to you now, I can't point to specific documents that

9  follow all 27 of those devices, Your Honor.

10       MR. GOROKHOV:  Your Honor, if I may.  My colleague

11  just pointed out that the Assistant U.S. Attorney was speaking

12  with the case agent in the hallway.  I just wanted to be sure

13  that the substance of those communications were was not --

14       THE COURT:  Was not the substance of the inquiry?

15       MR. GOROKHOV:  Of the inquiry, yes, Your Honor.

16       THE COURT:  Were there conversations with the case

17  agent that you wanted to put on the record?

18       MR. GARDNER:  No, Your Honor.  I did not speak to the

19  case agent.  I walked straight to the corner and got on a phone

20  call, Your Honor.

21     There was no conversations with Joshua Kimrey, unless he's

22  referring to another counsel.

23       THE COURT:  All right.  Let's find out.

24       MR. GOROKHOV:  To clarify, Your Honor, we also want

25  to know a representation as to when Mr. Gardner learned the

1  information regarding the devices that -- regarding this

2  representation that he just made to the Court.

3            **THE COURT:**  Right.  No, I agree with you, because

4  this is why I'm asking, is --

5            **MR. GOROKHOV:**  Right.

6            **THE COURT:**  -- I want to get to the bottom of why I

7  have several returns that were given last night which

8  memorialized -- and I'm looking at the -- the return documents

9  from Mr. Masood, at best, show that the special agent returned

10  Item 11, which is a printer, to Ms. Akbar, Filza Akbar on

11  April 27, 2022.

12     And then the subsequent custody documents, as part of that

13  packet, stop at April 6th, 2022.  They were all put into

14  evidence and given -- it appears to be given to a number of

15  individuals, but, you know, received by Lynch, Sean, Jeffers,

16  Michael, Robert, Snyder, all for evaluation of evidence.

17  That's where the chain of custody stops with regard to the

18  devices seized on that day in that warrant return.

19     With regard to Ms. Peebles, I believe it is, there were --

20  the devices that are listed in that return seem to have been

21  released to DFE, five and seven.  So there are eight devices,

22  one through eight was -- were released, according to this

23  document, to Joshua Kimrey, the evidence custodian.  And then

24  there's a subsequent -- even though it says one through eight.

25  And then it looks like Special Agent Kimrey must have brought

1  them five and seven back, and then those were released to DFE.

2  I don't know who that is.

3      But you see my point is, the more -- the more we look at

4  these, the less likely it is that all devices, at least on this

5  record, have been returned to the owners.  Or I suppose the --

6  the people who were the targets of the search.

7      So no other documents, and I'm not prepared to accept an

8  oral representation, so what am I going to do with that fact?

9          **MR. GARDNER:**  Your Honor, we did bring Agent Kimrey

10  with us.  He's prepared to testify about all the documents.

11          **THE COURT:**  Why doesn't the agent have chain of

12  custody on this?  I don't want his oral representation two

13  years later.  I want the documents.  I mean, unless we all want

14  to sit for a two-hour cross-examination by defense counsel

15  about how they are trained and how they are told and why the

16  importance of chain of custody, where are the documents?

17          **MR. GARDNER:**  Your Honor, I'm at least aware that

18  one -- one set of documents was not able to be produced in time

19  for this hearing, and that was what I had mentioned within the

20  evidence room, as devices were being imaged.  So that's a

21  document that is going to be coming -- what I understand, Your

22  Honor, is what's happened, is Agent Kimrey will have this chain

23  of custody that's in front of the Court up until it's logged

24  into the evidence room, and then another system takes over.

25  That individual was not in the office and nobody else had

```
 1   access to the room --
 2             THE COURT:  So there's nobody -- nobody within his
 3   agency right now who can print out or send an e-mail copy of
 4   this chain of custody?
 5             MR. GARDNER:  I think today there is, Your Honor, and
 6   it just was not available yesterday.
 7             THE COURT:  Okay.  We started this hearing almost two
 8   hours ago.  Can one of you check with Agent Kimrey as to where
 9   the chain of custody documents are?
10             MR. GARDNER:  Yes, Your Honor.
11             THE COURT:  Thank you.
12        Oh, where did it go?
13        (Pause in the record.)
14             MR. MANTHRIPRAGADA:  Your Honor, may I address the
15   Court?
16             THE COURT:  Of course.
17             MR. MANTHRIPRAGADA:  Your Honor, I spoke to Agent
18   Josh Kimrey outside, and he's indicated to me as of right now,
19   we have all but two of the chain of custody documents for every
20   device that was seized and subsequently returned.  The chain of
21   custody documents are complete, that means they would go from
22   the moment of seizure to the moment of return.  They have
23   signatures on them.  All those documents are on the agent's
24   computer right now that were sent to him.
25        We can upload those.  He is waiting for two other
```

1  documents that would complete the entire set.

2          **THE COURT:**  What do I have now?  I don't have the

3  complete documents that you sent to defense and me last night.

4          **MR. MANTHRIPRAGADA:**  Your Honor, Mr. Gardner may be

5  able to address that a little bit better.

6          **THE COURT:**  Okay.

7          **MR. GARDNER:**  Your Honor, it very well may be that

8  what we have now are the chain of custody documents outside of

9  the document I was discussing.  So the chain of custody

10 documents follow the document from seizure into the evidence

11 room, and then from the evidence room to its ultimate

12 disposition.  I understand there was some missing -- the truth

13 is, I actually don't know -- I don't know what the difference

14 will be, and what documents are about to be, you know,

15 produced.

16         **MR. MANTHRIPRAGADA:**  Your Honor, just to supplement

17 that.  I believe that's right.  So essentially, the documents

18 that you have would show the signatures up until they were

19 checked into the evidence room.  These would be everything else

20 after that.  And they were on a separate -- separate database,

21 and that's why we didn't have access to them, is what I

22 understand.

23         **THE COURT:**  And they were never produced to defense?

24         **MR. MANTHRIPRAGADA:**  Your Honor?

25         **THE COURT:**  Not produced to defense, obviously?  They

1    were never produced to defense?

2            **MR. MANTHRIPRAGADA:**  It's my understanding that they

3    were not.  I think what was produced to defendant is what the

4    items the Court has.

5            **THE COURT:**  Right.  When they were produced to me,

6    they were produced to the defense for the first time.  Okay.

7        All right.  Well, we'll wait on that.

8        Now, government, you know, these were my questions --

9    defense, rather, these were my questions based on what I

10   received.  I know you also have concerns about productions

11   regarding witnesses.  I'm happy to allow you to -- to sort of

12   tell me where you want to go next, based on your motion at ECF

13   241.

14           **MR. GOROKHOV:**  Thank you, Your Honor.

15       Thank you.  Your Honor, I think given, kind of, the

16   gravity of what we've been talking about for the past two

17   hours, I think I should focus on that.

18       First of all, Your Honor, I think your proposed remedy

19   here to exclude the two witnesses, we ask that the Court

20   formally impose that remedy and issue an order to that effect.

21       Secondly, Your Honor, in light of what's come out today,

22   and specifically, that Your Honor found that the government has

23   acted, at the very least, recklessly with respect to its

24   representations in a letter on DOJ letterhead signed by an

25   Assistant U.S. Attorney, the history of inconsistences in

1  this -- with respect to this, and that -- that would include,

2  Your Honor, going back to the very first conversation

3  Mr. Goldman and I had with Mr. Gardner.  We said, what's the

4  status of these devices?

5       So there's a history that goes before what you've seen,

6  Your Honor.  We said what's -- what's the history -- what's the

7  status of these devices?

8       "Well, my understanding is they were imaged but never

9  reviewed, and then they were returned.  But I'll find out."

10      Several days later, he was pressed by me again for an

11  answer, and he said, "Oh, yes, they were imaged and returned,

12  but never reviewed."

13      Yesterday's call, he made another very specific

14  representation, "They were imaged, filtered, but not reviewed

15  because of budgetary reasons."

16      I don't know if Your Honor recalls that, that he says

17  there wasn't a budget, they didn't have the resources to review

18  the -- I don't remember --

19          **THE COURT:**  Was that on the call yesterday?  Because

20  I don't remember that.

21          **MR. GOROKHOV:**  Yes, Your Honor.  I don't remember if

22  he specifically used the word "budget."  Maybe my --

23          **MR. GOLDMAN:**  Resources.

24          **MR. GOROKHOV:**  Resources.  They didn't have the

25  resources to review them.  Very specific representations.

1      And now, we get, you know, that the version that Your

2   Honor has just taken apart piece by piece.

3      So I think in light of this record, Your Honor, in light

4   of the government's deliberate misrepresentations about even

5   facts such as who was present on the phone call on yesterday's

6   hearing, I think the time has come now to order disclosure of

7   all communications, internal communications relating to the

8   devices at issue and relating specifically to Jackson and

9   Peebles.

10      I think we've gone far --

11           **THE COURT:**  Well, let me ask you this.

12           **MR. GOROKHOV:**  Yes, ma'am.

13           **THE COURT:**  If I grant this request and follow

14   through on, at a minimum, of what I said I'm going to do, which

15   is exclude these witnesses, then what's the relevance of

16   anything with regard to Jackson or Peebles?

17           **MR. GOROKHOV:**  The relevance, Your Honor, is that

18   once we've seen the kind of record that we've seen, I think we

19   need to drill down deeper into the issue of bad faith and find

20   out just how deep that goes.

21           **THE COURT:**  How much worse does it get in terms of

22   no -- no *Brady* review?  The status right now --

23           **MR. GOROKHOV:**  Yeah.

24           **THE COURT:**  -- at best is no *Brady* review and being

25   told something different with regard to 27 devices.

 1            MR. GOROKHOV:  Your Honor, I think it gets --

 2            THE COURT:  Why am I -- I just want to know why --

 3            MR. GOROKHOV:  Sure.

 4            THE COURT:  That's about as bad as it gets, in my

 5   view.

 6            MR. GOROKHOV:  Sure.

 7            THE COURT:  And I'll give the government an

 8   opportunity to correct and clarify why I'm wrong on that,

 9   but --

10            MR. GOROKHOV:  I think the reason we need to find out

11   how much worse it gets is that -- of course, the ultimate

12   remedy is dismissal.  Right?  The ultimate remedy is dismissal

13   for prosecutorial misconduct.

14        And I think we have enough here, as I mentioned yesterday,

15   a case, Your Honor, from the Southern District of New York

16   United States v. Sauder.

17            THE COURT:  Prosecutorial misconduct, that's a heavy

18   lift, though, right?  It has a flavor of intentionality.  Maybe

19   you'll find it, maybe you won't.  Will we get there in ten

20   days?  What are we doing in trial?

21            MR. GOROKHOV:  I mean, your Honor, we have to pursue

22   all of our remedies.  We certainly don't believe we want to

23   drop the ball on this.

24        And I think there's just more than enough here, Your

25   Honor, to -- there's more than enough here, Your Honor, to

1  pursue this.  I think there's way more than enough.

2      And also, Your Honor, it's a due process issue.  We can't

3  ignore it.

4      We need to go -- we need to find out how far the due

5  process violation goes.

6      So we would ask, Your Honor, that these -- the government

7  be ordered to produce these materials by no later than close of

8  business Monday.  Not midnight on Monday, not midday on

9  Tuesday.  We need those materials in order to seek further

10 appropriate relief from the Court.

11     And, Your Honor, we need -- just to further make the

12 record on this request, Your Honor, we need these

13 communications because they bear on potentially further Rule

14 16, *Brady*, and *Giglio* violations, and they bear on other

15 individuals and witnesses, potentially, that are involved in

16 this case.  I mean, if the government has taken this kind of

17 approach to this fundamentally Rule 16 and *Brady* evidence, you

18 know, it's important to know what else is out there.  We can't

19 just -- we can't just, now, assume that everything else is

20 normal.

21     Thank you, Your Honor.

22         **THE COURT:**  All right.  Government, what do you want

23 me to know?  Where do you want this to go right now?

24         **MR. GARDNER:**  Your Honor, I guess as soon as I hear

25 the word "prosecutorial misconduct," this Court should get a

1    much more detailed account of how this came about and how we

2    got to where we are.

3            **THE COURT:**  Which is kind of why I -- like for now,

4    right, I want to focus on *Brady*, *Giglio*, Rule 16, because in my

5    view, at least, your case is in a ton of hot water just on

6    those.  I don't even have to get to prosecutorial misconduct.

7        As a matter of fact, I think you wouldn't want to invite

8    that, right?  So you can just talk to me about the rules and

9    the Constitution, and we'll take it from there.

10           **MR. GARDNER:**  Your Honor, this -- as the Court is

11   aware, this case was turned over as Adam Ake was leaving the

12   office.  It was about May, I think, May or June.

13       And from that time until now, there have been multiple --

14   you know, weekly at least, sometimes daily phone calls with

15   defense counsel.  And this is -- this is all context, and I --

16   of course, it colors what's coming next with the *Brady* and the

17   *Giglio* and all of that stuff.  But this case is in a very

18   different posture.  Up until three weeks before trial, we were

19   actively engaged in plea negotiations.

20           **THE COURT:**  You do appreciate -- you do appreciate

21   that as an Assistant United States Attorney, you must operate

22   on parallel tracks.  It is no excuse that you are -- it happens

23   all the time that you offer a plea -- that's why you've got to

24   be careful as the prosecutor.  You offer it, it has a sunset

25   date.  The defense doesn't take it.  The defense is out of

1  luck.

2       If you made that mistake, that cannot -- that doesn't --

3  that doesn't -- that doesn't contextualize any of this, because

4  you also have that affirmative obligation to be ready for

5  trial.

6            MR. GARDNER:  Understood, Your Honor.

7       I think I was mentioning that -- not to say, of course, we

8  weren't doing those parallel tracks of efforts, but to say

9  that -- that the -- when the case was turned over, the

10  government understood, based on very clear recollection, I

11  think what we're dealing with here is a misrecollection of

12  whether the e-mails were reviewed by AUSA Ake.  There was a

13  turnover which -- what was conveyed was these devices were

14  taken and then returned, didn't do a review.  That was what the

15  government understood at the time.

16            THE COURT:  And you're saying you understood that at

17  the time?

18            MR. GARDNER:  That's correct, Your Honor.

19       I understood at the time and throughout this process until

20  counsel changed, and so these issues were raised, that that was

21  what was actually accurate.

22            THE COURT:  Didn't that strike you as fundamentally

23  flawed, that that needed to get run by somebody else?  You have

24  an agent.  The agent swears under oath in multiple affidavits,

25  right, that the need for electronic devices is because that's

1    how fraudsters roll.  These devices will specifically show how

2    the scheme was set up, using computers to do it, and it will

3    exonerate people who are not involved.  That's what your agent

4    said.

5         So when you get this case, and you learn that 27 devices

6    were taken pursuant to a search warrant, but none were reviewed

7    according to whoever told you this, which is another question I

8    have, and they were all returned, doesn't that strike you as a

9    little strange?

10        Or were you truly just in the posture that this is going

11   to plead anyway, so I don't have to worry about it?

12        **MR. GARDNER:**  No, Your Honor, I don't think we were

13   in that posture.

14        **THE COURT:**  Okay.  Okay.  So did you run it -- I

15   mean, frankly, I got such concerns about how this case was

16   managed and supervised.

17        And I tell you, Mr. Manthripragada, if you take this back

18   to your office, every criminal trial I have right now has some

19   problem with it.  I don't know what's going on, but, you know,

20   this should be something that you got to -- you got to run by

21   somebody else.  27 devices, and you accept that they weren't

22   looked at and returned?  I'm trying really hard to give you the

23   benefit of the doubt here.

24        **MR. GARDNER:**  Your Honor, what -- what I'm trying to

25   say with the context --

 1          **THE COURT:**  Yeah.

 2          **MR. GARDNER:**  -- is that it was very clear based

 3   on -- again, sort of -- an informal relationship with defense

 4   counsel where we were both sort of trying to get to the finish

 5   line and share what we needed to, admit what we needed to, and

 6   sort of get at the issues.

 7       It was very clear from those conversation that is this was

 8   not going to be a document-heavy case from their perspective

 9   and from ours.  And as evidence of that, I would say that there

10   was -- one of the discoveries, you know, the discovery -- the

11   third discovery in this case was the entire Infused server,

12   which was one million e-mails, the entire accounts of Kristine

13   Gillespie who was an accountant at Infused, Michelle Peebles,

14   and Akbar Masood.  The entire account.

15       All counsel were given access to that -- and that has now

16   been turned over.  All counsel were given access to that folder

17   and basically with the message that if this is relevant to your

18   defendant, here are these e-mails.

19          **THE COURT:**  Okay.

20          **MR. GARDNER:**  They were downloaded by Mr. Masood's

21   counsel.  Never mentioned again.

22       I understand, Your Honor --

23          **THE COURT:**  That's the Infused server.  So you gave

24   over the Infused server.

25       What else?

1        **MR. GARDNER:**  Yes, Your Honor.  So what I'm saying

2    the fact that that counsel didn't download that material, which

3    was the e-mail accounts of one of these co-conspirators, and

4    certainly if the issue was looking through materials

5    meticulously for *Brady* or --

6        **THE COURT:**  It's whose responsibility to look through

7    for *Brady*?

8        **MR. GARDNER:**  It is the government's responsibility,

9    Your Honor.

10       **THE COURT:**  Right.  And you know that jury

11   instruction where the jury is told, like, the defense doesn't

12   have to do anything?

13       **MR. GARDNER:**  Understood.

14       **THE COURT:**  They can sit on their hands.  They don't

15   have to ask a question.  They don't have to put on a case.

16   That kind of undercuts any thrust to, well, they didn't look at

17   the stuff we did give them.

18       **MR. GARDNER:**  Your Honor, that materials has been

19   reviewed for *Brady*.  And that -- much of our exhibit list that

20   Your Honor received are documents from that download.  We have

21   not found any *Brady*, otherwise, we would have turned it over.

22   I have personally looked through those materials.

23       **THE COURT:**  I understand.  But -- but because you

24   honored a *Brady* obligation for one server doesn't negate the

25   fact that you took 27 devices and, by your own admission, no

1    one in your office reviewed for *Brady*.  How does that --

2              **MR. GARDNER:**  I understand, Your Honor.

3              **THE COURT:**  How does that -- tell me, from a legal

4    perspective, how I should -- how that's mitigating?  Or from a

5    factual perspective?

6              **MR. GARDNER:**  Your Honor, the fact that it was clear

7    that -- that this was not going to be a document-heavy case,

8    and that prior counsel wasn't interested in those, I think

9    does -- does contextualize the -- the -- you know, the lack of,

10   I guess, followup of where these devices were.  I mean, if they

11   were -- if they were taken and returned, at that point, you

12   know, there were no requests for them -- I understand that

13   mistakes were made in terms of, they should have been reviewed

14   and that evidence affirmatively turned over.

15       But another piece of evidence that could have been and

16   should have been handled the same way, that Infused server, was

17   turned over, nothing was taken, and no requests were made from

18   that point up until counsel changed.

19             **THE COURT:**  Right.  Which persists in the fundamental

20   misunderstanding of *Brady* and your obligations.

21       Listen, throughout this case, if you had read the docket

22   from beginning to end when you got the case, you would have

23   seen that your predecessor counsel made repeated

24   representations, informal motions to toll, as well as to the

25   Court, that the defense relied on and then said, listen, we

1    asked for it, we're waiting on it, we're trying to work

2    together because we need them, right, regarding the devices.

3    Okay?

4        So I'm going to assume you did that, because, you know,

5    you're a thorough lawyer, member of the court -- or officer of

6    the court.

7        So, again, how does giving over the Infused server help

8    with respect to being ten days away from trial and not giving

9    over any of the devices that were the subject of all these

10   letters?

11           MR. GARDNER:  Your Honor, I believe that the Court's

12   question was, basically, how could you -- how could you not,

13   you know, look more into those 27 devices and then feel like

14   they should be turned over?

15       And what I'm saying is, I understood all of them had

16   been -- had been returned.  And at that point --

17           THE COURT:  Let's -- let's stay with that, though.

18       If it -- if it's your position that the -- that the

19   devices were returned and that somehow mitigates any *Brady*

20   violation or prejudice, think about who they returned to.

21       Mr. Masood gets his back -- and I'm not -- be clear, I'm

22   assuming this for the sake of argument, there's no record

23   evidence this happened.

24       Mr. Masood gets his back, Ms. Jackson gets hers back,

25   Ms. Peebles gets hers back.  For Ms. Jackson, that's nine

1  devices; for Ms. Peebles, that's eight devices.

2       How is Mr. Masood ever supposed to get his hands on those?

3  How does that mitigate the prejudice because you gave them back

4  to their owners, the ones to Jackson and Peebles?

5            **MR. GARDNER:**  Your Honor, it is somewhat mitigated by

6  the fact that a similarly situated dataset with which could

7  have had that sort of cross -- cross-production of other

8  individuals' discovery was basically declined and viewed as not

9  relevant.

10           **THE COURT:**  Could have, should have, maybe.

11      How do we know -- how do we know that that dataset is

12  similar?  How do I know that's what's on the -- okay.  Let's

13  step back.

14      We've got Company A in the indictment, right?  Which is

15  which company?

16           **MR. GARDNER:**  That would be Infused, Your Honor.

17           **THE COURT:**  That would be -- Company A is Infused?

18  Okay.

19           **MR. GARDNER:**  I believe so, Your Honor.

20           **THE COURT:**  Okay.  And then we've got HMA, which is,

21  according to the government, a shell, right?

22           **MR. GARDNER:**  Yes, Your Honor.

23           **THE COURT:**  And then we've got Case, right?  We got

24  another company?

25           **MR. GARDNER:**  Yes, Your Honor.

1          **THE COURT:**  Any other companies that are going to be

2  relevant in the trial?

3          **MR. GARDNER:**  No, Your Honor.

4          **THE COURT:**  Okay.  So you have one server that you

5  did turn over, but you have -- and that would -- that would

6  include documents for the -- wait, Mr. Gorokhov, maybe you can

7  help me out here?

8          **MR. GOROKHOV:**  Your Honor, I think there's a big part

9  that Mr. Gardner is skipping over on the Infused server.

10     So what the government actually did with respect to the

11  Infused server, is that they went to Barbara Rosas, who is the

12  wife of the man who initiated this prosecution against

13  Mr. Masood.  He ran to the Loudoun County Sheriff's Office, and

14  the ball went from there to Joshua Kimrey.

15     Mr. -- as I think I mentioned on yesterday's call, Marlon

16  Johnson, and his wife, Barbara Rosas Johnson, are two

17  individuals, who we will submit to the Court, have, even with

18  our limited investigation to date --

19          **THE COURT:**  There's the *Giglio*.

20          **MR. GOROKHOV:**  A lot of *Giglio*.

21          **THE COURT:**  And she's the one that turned over the

22  thumb drive with some e-mail accounts for Mr. Masood and

23  others?

24          **MR. GOROKHOV:**  Yes.

25          **THE COURT:**  Okay.

```
 1              MR. GOROKHOV:  Yes.

 2        Now, to be fair to the government, we received a report

 3   last night that said apparently, like, a forensic examiner was

 4   looking over her shoulder.

 5              THE COURT:  Right.

 6              MR. GOROKHOV:  That's what the report says.

 7        The problem is that the government didn't say turn over

 8   all your e-mails, like Ms. Rosas --

 9              THE COURT:  Turn over the server, is that your point?

10              MR. GOROKHOV:  No, no, no.

11              THE COURT:  That the server was not turned over, is

12   that the defense's position?

13              MR. GOROKHOV:  That is what they did.

14        They said, we just want three e-mails, we just want three

15   e-mail accounts.  We don't want Marlon's e-mail account.

16              THE COURT:  Okay.  I understand the position.  The

17   position of the defense is, whatever the government made

18   available to you is only the three e-mail accounts they got

19   from Rosas?

20              MR. GOROKHOV:  And that's all they obtained for

21   themselves.

22              THE COURT:  Let me confirm that with Mr. Gardner.

23        Is that accurate?

24              MR. GARDNER:  That's correct, Your Honor.

25              THE COURT:  So why are you telling me that the
```

1    Infused server is what you gave over?

2              **MR. GARDNER:**  Server is an imprecise term, Your

3    Honor.

4              **THE COURT:**  Oh, it's wrong.  It's flat out wrong.

5              **MR. GARDNER:**  Your Honor, if I said server, I'm

6    misspeaking.  What happened is these --

7              **THE COURT:**  You are so -- you're so -- you're such a

8    young man.  You know what these words mean.  You know the

9    difference between when the server is down and you can't get

10   any work done because the server is down.  It means that huge,

11   honking piece of equipment that everything in your organization

12   goes through.  Not three e-mails turned over by some witness.

13        So let's -- let's be very precise here.

14        What you say you provided to the defense was what

15   Ms. Rosas provided to you; is that right?

16             **MR. GARDNER:**  Yes, Your Honor.  And to be clear, she

17   had access to the Infused server, went onto that server and

18   downloaded those three individuals' entire e-mail accounts.

19        When I said server, it was imprecise, but she accessed the

20   server --

21             **THE COURT:**  Let's be precise.

22        At the agent's direction?

23             **MR. GARDNER:**  Yes, Your Honor, at the agent's

24   request.

25             **THE COURT:**  At the agent's direction.  That is not a

```
1   full -- that's not a robust discovery production that's going
2   to take place of the 27 devices.  That's not even close.
3        Where is the Infused server?
4            MR. GARDNER:  I believe it's at Infused, the physical
5   location, Your Honor.
6            THE COURT:  The government --
7            MR. GARDNER:  And I want to be clear, Your Honor, I
8   am not saying that the Infused server somehow takes the place
9   of the 27 devices.  I want to start from, you know, first
10  principles, those devices should have been turned over.  There
11  was a mistake there.  I think now we're getting to the mindset
12  of the government and the egregiousness --
13           THE COURT:  No.  Right now we were talking about
14  mitigation of prejudice.  I'm not even talking about
15  prosecutorial misconduct.
16           MR. GARDNER:  I'm sorry.  That -- yes.
17           THE COURT:  But it doesn't.  It doesn't.  I'm making
18  a factual finding.  It cannot.
19       You get three e-mail accounts.  Sure, one of them is the
20  defendant, right?  But you told me it was the server.  The
21  server would have all kinds of things on it for a business.
22       And -- and it cannot be one in the same with the devices.
23       When -- when there's multiple companies involved, multiple
24  players, it's a complicated case.  So now we know it's not a
25  server, it's three e-mail accounts.
```

1        Do you have date ranges for me?  On the e-mails?  Like,

2   who --

3        **MR. GARDNER:**  There was an e-mail provided to defense

4   as part of Josh Kimrey's *Jencks* that have those dates.  I

5   believe it's 2013 to 2019, but I don't know exactly.  But it

6   was a large date range.

7        **THE COURT:**  But that's -- that's not going to take

8   the place of, like, you know, you got two cell phones, and

9   people are texting and e-mailing and Snapchatting and

10  Instagramming and everything else that gets downloaded into

11  these devices that now you have to get a search warrant to get

12  into, right?  I mean -- go ahead.

13       **MR. GARDNER:**  Okay.  The point -- the reason this is

14  relevant to prejudice, Your Honor, is this dataset had e-mails

15  from Michelle Peebles, and if that dataset consisting of all of

16  her e-mails ever sent or received from anybody at Infused,

17  including communications between her and the defendant, were

18  not deemed -- were not deemed relevant enough to accept and to

19  download by prior counsel, then it does sort of mitigate -- at

20  this point, Your Honor, we are looking at potential remedies,

21  and we're looking at sort of a speculative --

22       **THE COURT:**  First of all, how would you know what the

23  defense looked at and didn't look at?  That's a huge problem.

24  How does the government know the defense's work product?

25       You're going to argue now that the defense's due diligence

1    or lack thereof is some reason that I should forgive this huge

2    *Brady* violation.

3         So I got a question for you.  How do you know that?

4    Because when we have, like, CJA counsel getting discovery from

5    the government, it's my understanding that you don't have any

6    transparency on that.  So tell me how you know what they've

7    looked at?

8              **MR. GARDNER:**  Your Honor, there's a confirmation

9    e-mail every time somebody accesses a Box folder.  So we can

10   tell who accessed that folder based on whether we received

11   confirmation e-mails from that counsel.

12             **THE COURT:**  Did you know that, defense counsel?

13             **MR. GOROKHOV:**  We suspected it, Your Honor.  We

14   didn't know it.

15             **THE COURT:**  You did not know?

16             **MR. GOROKHOV:**  No, we didn't know for sure.  But just

17   to be clear, he's talking about prior counsel here.

18             **THE COURT:**  I understand that.  No, I know that.

19        I'm just thinking through --

20             **MR. GOROKHOV:**  Yeah --

21             **THE COURT:**  I mean, you're not -- you can't listen to

22   counsel's calls, right?  You can't follow their -- whatever

23   they do to generate work product in a case.

24        I don't know -- Mr. Gorokhov, it's been a minute, like,

25   when you all get discovery from the government, and you have

1  access to a portal, aren't there any communications about

2  whether the government knows what you're looking at when?

3          **MR. GOROKHOV:**  I think -- that's a really good

4  question, Your Honor.  I think because -- I think I can speak

5  for all the counsels sitting here today, that when we get

6  discovery and we receive a notice --

7          **THE COURT:**  Yeah.

8          **MR. GOROKHOV:**  -- in our e-mail, you know, we like

9  obsessively click on it and download it right away, right?

10 Because we can't help ourselves.

11     So I don't think -- from my perspective, that's not a --

12 it's not something I --

13         **THE COURT:**  Focused on.

14         **MR. GOROKHOV:**  -- thought about, because the

15 government can assume that I'm going to download and look at

16 discovery.

17     But now it's being used kind of as a sword.  I mean,

18 that -- quite frankly, that's not something I've encountered

19 before.

20         **THE COURT:**  I got to think about it, but I don't

21 think it matters for *Brady*.  I really don't.  I'm not sure how

22 it should.  Maybe it matters in an ineffective assistance some

23 day.  Maybe it will.  But I just -- that's a very troubling

24 representation, that basically you can now capture every --

25 every time defense counsel looks at a document, you get an

1    e-mail.

2        Does it tell you what they looked at?

3            **MR. GARDNER:**  No, Your Honor.  And I want to be very

4    clear.  This is all -- I'm saying this all as context for why

5    the government didn't look into and turn over those 27 devices.

6    It is not saying that it's not somehow -- one is not a *Brady*

7    violation because another one is.

8        I just think the Court will benefit, because ultimately

9    you have to make a determination about -- about the

10   egregiousness of the errors and all of that.  I think the Court

11   is going to benefit from some of what I'm saying.  I'm

12   absolutely not trying to say that one excuses the other.  This

13   is -- this is all leading up to the Court's determination.

14           **THE COURT:**  Then it -- then it -- right.  I

15   understand that.

16       But then it kind of begs the question as to why we're

17   having the conversation.

18       So part of the reason why we're having the conversation is

19   because, I believe you started out with, well, provision of the

20   Infused server factually overlaps with what would be in the

21   devices.  But now I've learned it's not the provision of the

22   Infused server, it's three e-mail accounts, albeit broad, but

23   they're just the e-mail accounts.  And they are of three

24   individuals.  Am I getting that right?

25           **MR. GOROKHOV:**  Yes, Your Honor.

1          One other important point that my colleague pointed out,

2     is that one of those e-mails does not belong to Harriett

3     Jackson, who is an essential player in this case.  Right?

4          So those three e-mails, I believe, are Mr. Masood's

5     e-mail, Ms. Peebles' e-mail, and Kristine Gillespie, who was

6     a --

7               THE COURT:  A witness.

8               MR. GOROKHOV:  She's a witness.  She was involved in

9     hiring -- interestingly enough, though, Kristine Gillespie is

10    the right-hand person for Ms. Johnson, and Ms. Johnson's --

11              THE COURT:  Rosas Johnson?

12              MR. GOROKHOV:  Rosas Johnson, correct.

13              THE COURT:  Okay.  But your point is right now is, it

14    doesn't even include Ms. Jackson.  So there's no overlap with

15    regard to Ms. Jackson.

16              MR. GOROKHOV:  Right.  And, also, Your Honor, these

17    are not -- there's multiple entities and multiple e-mail

18    accounts we're talking about.

19              THE COURT:  Right.  This is just from Infused.

20              MR. GOROKHOV:  Yes.

21         And, of course, I think, Your Honor, you pointed this out,

22    but when we're talking about things like *Brady* and *Giglio,*

23    those are the kinds of things that are not likely to reside.

24    They are precisely not likely to reside on the Infused e-mails.

25    Right?

1    Because you have, for example, I always forget which one,

2   Your Honor, but just to take an example, you have codefendants,

3   testifying codefendants in this case who stole the identities

4   of multiple people close to them, right?  Ex-husbands,

5   boyfriends.  Made money in their name.  And in one case, even

6   saddled the guy with, like, over a $100,000 in tax debt.

7    And these are the kinds of things you see in text

8   messages, you know -- and then encouraged the man to obstruct

9   justice by lying to --

10        **THE COURT:**  We're not going to see that on the

11   Infused the e-mail?

12        **MR. GOROKHOV:**  We're not going to see that.  That's

13   my point.

14        **THE COURT:**  Okay.  Got it.  Got it.

15    So -- so we got Infused.  We know the scope of that.

16    What else is going to mitigate the prejudice?

17        **MR. GARDNER:**  Your Honor, it is, I think, relevant

18   that up until counsel basically was replaced, there was

19   discussions of -- you know, sort of stipulations, and basically

20   this is how the trial is going to go.

21    It was very clear that the defendant's counsel knew about

22   all of these documents.  They certainly knew these devices

23   existed.  They received the document -- you know, the device

24   back from -- the devices back from the government related to

25   Mr. Masood.  These documents were sort of known and there was

1  no other communications about them.

2      I understand it's our affirmative obligation, basically if

3  you don't want it or not, we're going to force feed you,

4  defense counsel, these document.  Absolutely, that's how it

5  should have happened.

6      What I want to tell you --

7          **THE COURT:**  No, hold on.  Stop for a second.

8      That may be a Rule 16 question.  That doesn't answer

9  *Brady*.  Okay?

10     Counsel can tell you all day long, because they want you

11 to chase some ball down some alley, right, that we're not

12 calling any witnesses, we don't care about this document, that

13 document, and the other.  Okay.

14     You still have an affirmative obligation to review what's

15 in your possession and only your possession and custody and

16 control, no one else's, for *Brady*.

17     So how -- how does the fact that Mr. Lowther said this is

18 going to be a documents trial, or "I'm not" -- "I'll stipulate

19 to that"?  That doesn't absolve you of your *Brady*.

20     You were going down a road of, well, what we did produce

21 has overlap with what we didn't review and we didn't produce.

22 Because one way to mitigate the prejudice is, as soon as we

23 learned that we still had the devices and we didn't give them

24 to the defense, we gave it to them.  You know, like, in

25 November or whatever.  That didn't happen.

1    But you were going down a road of what we did produce has

2  some overlap.

3    Is there anything else that overlaps with, as far as you

4  know, the 27 devices?

5         **MR. GARDNER:**  Your Honor, I don't think I used the

6  word overlap, and I don't want to represent that there's

7  overlap.  Maybe there is, maybe there is not.

8         **THE COURT:**  Then you have no mitigation, then.  You

9  have no mitigation.  See what I'm saying?  Like --

10         **MR. GARDNER:**  That -- that point is only to the sort

11  of the posture of the case and how the case was progressing,

12  because there's sort of an analogy I'm trying to make.  Not

13  that there was -- not the information itself, but if -- if a

14  server that's certainly -- a counsel who thought that I'm in a

15  zealous search for *Brady/Giglio* material would not have taken

16  that, it's -- it sort of puts the case in a different posture

17  and there's evidence of how -- why the government would not

18  have focused on these devices.

19         **THE COURT:**  No, it's not.  It's not.

20    You -- your *Brady* obligations are not dependent on the

21  defense.  That's why in the beginning of every case, you come

22  into court in an initial appearance, what does the magistrate

23  judge do?  Under the Due Process Protection Act, I mean, that's

24  how Congress is making sure that we get this point across to

25  you all, you got a *Brady* obligation.

1      So if the defense is totally falling down on the job, how

2    does that affect your obligations?

3           **MR. GARDNER:**  Your Honor, actually, I don't want to

4    represent the defense was falling down on the job.  I think

5    there was a strategic call that the case was going to go a

6    different way.

7      But it does not affect my *Brady* obligations, Your Honor.

8    And I feel like it does keep going back -- going back to that.

9      All I am saying is, when --

10          **THE COURT:**  Yeah.

11          **MR. GARDNER:**  -- when the government found out about

12   this, there was a very energetic response and attempts to

13   remedy the situation.  And the --

14          **THE COURT:**  When the government found out about what?

15          **MR. GARDNER:**  When we found out that there was

16   probably information on those devices that wasn't reviewed.

17     So the questions started to come in from defense counsel

18   about the devices and their imaging, and basically what counsel

19   represented is basically accurate.

20     We had conversations, they asked me, you know, where --

21   what's the status of these devices?  And based on what the

22   government knew and based on what I knew at the time, these

23   devices were imaged, never reviewed and returned.

24          **THE COURT:**  Who told you that?  Where did you get

25   that information from?

1          **MR. GARDNER:**  That would have been AUSA Ake and the

2    agent on this case, Your Honor.

3          **THE COURT:**  Told you that?

4          **MR. GARDNER:**  Yes, Your Honor.

5          **THE COURT:**  So Agent Kimrey and Ake told you the

6    devices were imaged, never reviewed, and returned?

7          **MR. GARDNER:**  Yes.

8          **THE COURT:**  And then last night, you were told the

9    opposite by the same sources?

10          **MR. GARDNER:**  Last night I get hold of AUSA Ake who

11    went through his e-mails and forwarded some of these documents.

12    And I think this is a relevant fact, Your Honor.

13       AUSA Ake is currently in a SCIF for almost every hour of

14    every day, and so contacting him has been very hard.  And I

15    have tried quite --

16          **THE COURT:**  You all knew that when he was leaving.

17    You knew that when he was leaving.  I knew that when he was

18    leaving.

19          **MR. GARDNER:**  Understood.

20       But when this question -- when this question was raised --

21    understood.

22       During the turnover of the case, these 27 devices, you

23    know, could have come up, probably should have come up, should

24    have come up.  But at the point when questions started to get

25    raised, I think there was a concerted effort to get to the

88

1   bottom of the questions; and frankly, we did it as fast as we

2   were able.

3        We are -- we are talking about, you know, the degree of

4   the *Brady* violation, and I agree that not turning over

5   something that the defense could find relevant would -- is part

6   of our *Brady* obligation.

7            **THE COURT:**  Here's the spectrum on *Brady*.  You got to

8   first look for it, right?  Because you take the items.  You

9   know your case.

10       So there's a violation for not looking.

11       Then if you look, and you don't -- and you find it, you

12  don't turn it over, there's a violation for not turning it

13  over.

14       Now, if you look, and in your view, it's not there,

15  there's no *Brady*, and the defense says, well, you mis -- you

16  mistook it, it is *Brady*.  Well, that's like the third tier,

17  right?  And that's almost -- my understanding of the law, is

18  like that's almost like never going to be -- win the day for

19  the defense.  Sometimes it does because the government's view

20  of *Brady*, in my view, can be cramped, but that's not where we

21  are.

22       We're like -- we're at the first stage, which is -- it's

23  in your exclusive custody.  They can't get to it.  It involves

24  the two co-conspirators who are on your witness list.  We can

25  all read between the lines on that one.

1    And you do not review it.

2    So in my view, the only mitigating would be well, what --

3    what can we do now, which is not much.  We're ten days from

4    trial, two and a half years out of Mr. Masood being arrested,

5    so I'm not going to saddle the defense with you got ten days to

6    go through 27 devices.  That's one.

7    Two, what other evidence was produced or made available

8    that would overlap to mitigate the prejudice so that your

9    point, which is they could have looked for it, and they didn't,

10   somehow rights the scales.  So far I've heard about the Infused

11   server -- not server, three e-mails.

12   What else?  Is there anything else that can mitigate that

13   prejudice?

14        **MR. GARDNER:**  Your Honor, I believe we are still

15   lacking for any -- any specific documents that are pointed to

16   by the defense.  And I understand that is not the question

17   here.  But they have had their own devices, and that would

18   include any e-mails that were exchanged between the defendant

19   and those co-conspirators.

20   What we don't have is potentially communications between

21   those co-conspirators, not including the defendant's.

22        **THE COURT:**  Okay.  I still don't have any evidence

23   that they have the devices.  Okay?  I'm still waiting on the

24   chain of custody that you say will show me that the devices

25   were all returned.  And it does not -- so that's one.  Okay?

1        Assuming the devices were returned, I might have some

2    questions for the defense on that, but it still doesn't get rid

3    of, like, the 18 devices that they don't have access to, even

4    if returned to their owners.

5        I suppose -- let me ask it a different way.  What other

6    evidence in your investigation, in your agent's investigation,

7    did you obtain any other servers or repositories of electronic

8    information that was disclosed to the defense?

9            MR. GARDNER:  Your Honor, there are -- as I

10   understand it, three buckets of documents in this case.

11       One, are the documents from Walter Reed, so the -- the

12   e-mail -- e-mails from Walter Reed were taken voluntarily of

13   individuals, you know, within Walter Reed, employees,

14   communications outside of Infused people.  That's bucket number

15   one.

16           THE COURT:  Okay.  Yep.

17           MR. GARDNER:  Bucket number two is that Infused

18   server -- not server.  Again --

19           THE COURT:  The three e-mails.

20           MR. GARDNER:  I'm using that word very loosely.

21           THE COURT:  E-mail accounts.  Nope, it's not a

22   server.

23           MR. GARDNER:  It's not a server.

24           THE COURT:  You got to demonstrate to me if it is.

25       Three e-mail accounts on a thumb drive given to the agent

1  by Ms. Rosas?

2          **MR. GARDNER:**  Yes, Your Honor.

3          **THE COURT:**  Okay.  Very good.

4          **MR. GARDNER:**  The third bucket is accounts taken

5  from -- I'm sorry, e-mails taken from the HMA server.

6          **THE COURT:**  HMA server.

7          **MR. GARDNER:**  Yes, ma'am.

8          **THE COURT:**  Is that a server?  Because I thought

9  there was conversation yesterday about it's not a server,

10 because you told me that this company doesn't even exist, so it

11 really isn't a server.  Although in your e-mail to the defense,

12 you said it was a server.

13     What is this thing that's HMA?

14         **MR. GARDNER:**  So the HMA business was registered with

15 a service provider and given a collection of e-mail addresses

16 to use.

17         **THE COURT:**  Okay.

18         **MR. GARDNER:**  My understanding, maybe they don't have

19 their own server, but it is a subcomponent of something that's

20 housed elsewhere.

21     But in vernacular, I think server is accurate in that

22 case, because it was a question of e-mails under the umbrella

23 of HMA, and somebody has access to all of these e-mail

24 accounts.

25         **THE COURT:**  Where did the government get that

1  collection of --

2         **MR. GARDNER:**  That was from a witness as well,

3  Salvator O'Donnell.

4         **THE COURT:**  Okay.  So the -- and what exactly did you

5  get from O'Donnell?

6         **MR. GARDNER:**  That would have been e-mails sent

7  within those HMA accounts -- or to and from those HMA accounts

8  that were on that -- that were on that e-mail account.  So

9  basically, any e-mail that was available to Mr. O'Donnell would

10 have been taken.

11        **MR. GOROKHOV:**  And if I may, Your Honor,

12 Mr. O'Donnell is not an IT person.  He was an assistant who

13 didn't deal -- his work wasn't even related to IT.

14   So here you have a lay witness who is pulling stuff off

15 of -- off of the cloud, essentially.

16        **THE COURT:**  Okay.  Well, I see the report Salvator

17 O'Donnell.  Kimrey receives an e-mail from O'Donnell on

18 November 13, 2020.  He was responsible for helping to create

19 HMA.  He was asked to provide e-mail from his HMA, LLC, e-mail

20 account.  So he responded by exporting his e-mails from his

21 account; is that right?  Am I reading that right?

22        **MR. GARDNER:**  Yes, Your Honor.

23        **THE COURT:**  So it's just his e-mails as the author or

24 the receiver, or if he CC'd, that's it?

25        **MR. GARDNER:**  That's what I understand, Your Honor.

1          **MR. GOROKHOV:**  Here, again, Your Honor, a little

2   context.

3          So sometime later in the investigation, after Mr. Masood

4   and others were arrested, Mr. O'Donnell contacted Agent Kimrey,

5   said, I don't want to get in trouble, I don't want to get in

6   trouble, how can I help you?

7          And then at that point, he also provided e-mails from

8   Case, from another entity, which I believe is not going to be

9   used in this case.

10          **THE COURT:**  But were provided?

11          **MR. GOROKHOV:**  But were provided.  We have them.

12          But just to give context on this witness, so this is a guy

13   who is really scared of being charged, and he's deciding what

14   e-mails to provide to the government.

15          **THE COURT:**  But at least in terms of this

16   representation that the HMA collection of e-mails were

17   provided, the only e-mails that were provided were those -- if

18   I'm getting this right, because it says he was asked to provide

19   e-mails from his HMA, LLC, e-mail account to the interviewing

20   agents, right?

21          **MR. GARDNER:**  Yes, Your Honor.

22          **THE COURT:**  So that's it.  I mean, there's not -- in

23   other words, he didn't provide the entirety of all e-mail

24   traffic for all e-mail accounts associated with HMA; is that

25   right?

1          **MR. GARDNER:**  That's right, Your Honor.  I just

2    wanted to point out that these points will be relevant at

3    trial, certainly, but I think they are cross-examination for

4    that witness in particular.

5          **THE COURT:**  I'm not talking about cross-examination.

6    I'm talking about mitigating the 27 devices.  You told me

7    Infused server, it's not a server, it's three e-mail accounts.

8    HMA server, it's not a server, it's a collection of e-mails

9    that you're taking as a rough approximation for a server,

10   that's fine.

11         But now what I'm learning is really what it is, is just

12   one e-mail account holder, Mr. O'Donnell, who gave whatever

13   came to, from him, or CC'd to him, right?

14         **MR. GARDNER:**  Whatever was available to him, yes,

15   Your Honor.

16         **THE COURT:**  Whatever was available to him?

17         **MR. GARDNER:**  Yes.

18         **THE COURT:**  Okay.  How -- what's his role in this

19   case that suggests that this would be somehow mitigating for

20   the 27 devices?

21         **MR. GARDNER:**  Your Honor, I was just trying to give a

22   fulsome inventory of all the documents in this case.

23         His role is essentially that he was asked by Mr. Masood to

24   set up HMA as a legal entity and to create e-mail addresses for

25   the different individuals, so that is his role.

1        But he was the one who had the tech knowledge to be able

2   to do that and set up the server.  I keep using server, but you

3   know what I mean, Your Honor, at this point.

4        **THE COURT:**  Well, he set it up.  But did he have any

5   role in the crime?

6        **MR. GARDNER:**  No, Your Honor.

7        **MR. GOROKHOV:**  Well --

8        **THE COURT:**  Okay.  Well, then -- right.  I mean, I'm

9   not sure how that could help or hurt.  It's not -- in other

10  words, he is agnostic.  He's got a very limited role.  And so

11  the e-mail traffic that he had couldn't, again, mitigate any

12  sort of prejudice in failing to look at the 27 devices.

13       **MR. GARDNER:**  I agree with that, Your Honor.  I'm

14  just trying to give an inventory.

15       **THE COURT:**  No, I agree with that.  And that's why

16  I'm asking for the inventory, and then I'm talking to you

17  about -- what I'm trying to do here is just kick the tires on

18  it, am I seeing it right?  Because you know your case better

19  than me.  And you know, like -- and some of these terms are not

20  being used quite right, so I got to get to the bottom of what

21  they are.

22       Okay.  So we've talked about Infused, and we've talked

23  about HMA.  What other repositories of electronic -- was those

24  the three buckets?  Are there any other buckets?

25       **MR. GARDNER:**  Those are the three buckets of e-mails,

1  basically.

2        **THE COURT:**  Any other electronic discovery that you

3  turned over or that you've made available to defense that we

4  haven't talked about?

5        **MR. GARDNER:**  Electronic, no, Your Honor.

6        **THE COURT:**  Okay.  Any other paper discovery that, in

7  your view, would mitigate any of the prejudice from the 27

8  electronic devices?  Because maybe -- you know, I don't know, I

9  can't know what that is, but I figure I would make sure we

10  cover the waterfront.

11        **MR. GARDNER:**  Strictly as mitigation, Your Honor, I

12  can't think of any paper documents that would serve as

13  mitigation.

14        **THE COURT:**  Like -- so Ms. Jackson coming in and

15  saying, here is the printout of all of my texts with Mr. Masood

16  on this device, nothing like that?

17        **MR. GARDNER:**  Nothing like that, Your Honor.

18        **THE COURT:**  All right.  Go ahead.

19     What else would you like me to know?

20        **MR. GARDNER:**  Well, Your Honor, we are -- well, at

21  some point -- in 2022, there was a request for *Brady*.  And I

22  think that's very clear.  And we didn't produce that material.

23  There was a formal request.  The Court has basically found that

24  at some point in 2022, that request was made.

25        **THE COURT:**  But not for *Brady*, for Rule 16.

1          **MR. GARDNER:**  I'm sorry, for Rule 16.

2          **THE COURT:**  Yeah, yeah.  Because there's no

3     obligation to make a *Brady* request.  Okay.  Go ahead.  Yep.

4          And I have found that, and I think it's pretty clear from

5     the ECFs that everyone considered it to be that.  Ms. Kelly, at

6     a minimum, in August of 2022 covered it for all defense with

7     regard to these devices.

8          **MR. GARDNER:**  Now, at a certain point, Ms. Jackson's

9     counsel raised a privilege issue about her own devices.

10          **THE COURT:**  Okay.

11          **MR. GARDNER:**  And so at that point, like, devices

12     were not cross-produced.  So I think that's relevant to how we

13     get here without the devices being produced.  Because at that

14     point would have been the logical point, I think, to produce

15     them.  And at that point, in that juncture in the case, the

16     codefendants were not willing to have their devices produced.

17          **THE COURT:**  Okay.  Stop for a second.

18          Do you have the date for me as to when the taint review

19     began?

20          **MR. GARDNER:**  Your Honor, that's the question the

21     Court asked at the beginning of this hearing, I believe.  I

22     still don't -- haven't been able to find a document, only to

23     say that July of 2022 was the e-mail where the taint team was

24     set up, and then the guidance --

25          **THE COURT:**  Okay.  So for purposes of making a

finding of fact, it seems like the record right now is that's

when the taint review began.  And what you're telling me it was

triggered by an invocation of privilege by Ms. Jackson; is that

right?

        **MR. GARDNER:**  I don't think it was triggered, Your

Honor.  I think we were going to do it anyway.

        **THE COURT:**  Okay.

        **MR. GARDNER:**  And I think that was just as a matter

of course with that many devices.  I think it was going to be

done regardless.

    And then a -- a question was basically posed to defense

counsel at large, if they wanted devices back, and if they

agreed, they would be produced, some sort of cross-produced,

and everybody would get everybody else's information.

        **THE COURT:**  Okay.

        **MR. GARDNER:**  At that point, Ms. Jackson's counsel

basically said, I don't waive privilege.  So at that point,

only -- each person's own devices were returned.

        **THE COURT:**  Okay.

        **MR. GARDNER:**  And, again, that is -- that is

important in a chronology, because at that point would have

been the logical point to make those disclosures.

    And then quickly, the case became one of negotiation, no

further requests were made.  And I understand they don't have

to be.  But no further inquiries were made.

1          **THE COURT:**  I thought you said in your letter to me

2    that the negotiations started in the fall of 2023.  So that's

3    not a quick negotiation.

4        As a matter of fact, from July of 2022, until I got the

5    case, there were several status conferences where the same

6    refrain was put before Judge Grimm, and then before me.

7        So what's the point of that?

8          **MR. GARDNER:**  In the meantime, Your Honor, the taint

9    review was going on.  So I guess what I should have said is,

10   the -- when that taint review was done, the case was then in a

11   different posture.  And no further requests were made from that

12   point onward.  Because there were people -- pleas were being

13   entered with pretty good frequency.  There was the assumption

14   that this case would plead out.

15       That was all the timeline to explain why it was not

16   immediately, you know, on the top of peoples' minds to go back

17   to this issue because it was simply not raised when it was

18   initially -- it was never revisited because the case was

19   progressing a certain way.

20          **THE COURT:**  Understood.  And the legal significance

21   of that is what?

22       Now, putting accusations of prosecutorial misconduct

23   aside, just focus for me right now on the *Brady*, the *Giglio*,

24   the Rule 16, what is the fact that you're having conversations

25   with the defense about a possible plea, even if they are, like,

1    really good conversations, and you all think it's going to

2    happen, like, what's the legal significance of that fact?

3           **MR. GARDNER:**  As it pertains to, I think, the

4    timeline, it's relevant.  And --

5           **THE COURT:**  How is it -- how is it relevant to *Brady*,

6    *Giglio*, and Rule 16?

7           **MR. GARDNER:**  It's relevant in that there was never

8    any other requests.  So there were never any -- there was never

9    an expressed interest in this material at any point.  And --

10          **THE COURT:**  So it's the government's position that

11   you've got to not only request -- let's start with *Brady*.

12       We're in agreement, no -- no obligation for the defense to

13   request, right?

14          **MR. GARDNER:**  Yes, Your Honor.

15          **THE COURT:**  So the plea agreement posture is a

16   nonfact for *Brady*.

17       Let's talk about Rule 16.

18       The docket is clear that the defense made the request.  It

19   was worked into motions to toll.  It's been worked into every

20   status that I've had, I know, because we've talked about it,

21   but also suggestive that Judge Grimm also responded.

22       So the fact that when plea negotiations were going on,

23   prior counsel at that point, at the end of 2023, didn't ask

24   again, you're saying that's a fact of significance?

25          **MR. GARDNER:**  It's only significant, Your Honor,

1   because the -- I started with a first principle that there was

2   a violation, and I think that's very clear.

3           **THE COURT:**  A Rule 16 violation?

4       **MR. GARDNER:**  And a *Brady* violation.

5           **THE COURT:**  Okay.  And so now this is just about

6   mitigation, in your view?

7       **MR. GARDNER:**  Yes, Your Honor.  I mean, we are simply

8   saying the egregiousness of what happened, and whether it can

9   be mitigated or the context surrounding it does go to the

10  remedy.  This is really -- we are sort of accepting that

11  mistakes were made in this case, and very serious mistakes.

12      But we are also saying that all these -- this context is

13  relevant to remedy.  And that's sort of the whole point of this

14  timeline, colloquy, and context, is going to that point.

15      I don't think there's any dispute that, you know, these

16  devices should have been turned over, and I think that's

17  evidenced by the fact that when this issue was raised, there

18  was a very concerted effort to get them to them, get them the

19  information that they should have had initially to the defense,

20  and that we are now prepared to make that available to the

21  defense, you know, as a whole.  Late in the game, yes, but we

22  are prepared --

23          **THE COURT:**  Had I not called that hearing yesterday,

24  that conference, what would have been left out there are

25  representations to me and the defense that those devices

1   weren't even looked at.  Like, you know what I'm saying?  Like,

2   we would have gone through a very different analysis.

3       But to your point, you're offering this up not to --

4   you're conceding a *Brady* violation and a Rule 16 violation, and

5   you're saying this is offered up only when we talk about what

6   happens next, the remedy.

7       Am I getting that right?

8           **MR. GARDNER:**  Yes, Your Honor.

9           **THE COURT:**  Okay.  Mr. Gorokhov, what --

10          **MR. GOROKHOV:**  Yes, Your Honor.  Since there is a lot

11  of talk about plea negotiations, I just wanted to put something

12  on the record.

13      Obviously, we were not there for that part of the case.

14  Our understanding, from our client, is that the plea

15  negotiations consisted of the government's making an offer, and

16  that offer being quickly rejected by Mr. Masood.

17          **THE COURT:**  Well, I know that in the docket that

18  there was some communication back in the beginning of the year

19  about let's give peace a chance, and can we have a little more

20  time on the motions.

21      And I thought I was very clear to all codefendants, I

22  actually denied the initial motion, because I said, well, you

23  all got to give me one -- because I think it was Mr. Masood's

24  counsel who wanted it.  I said, you all have to be on the same

25  page, and I don't want to change the motions deadline.

1      **MR. GOROKHOV:**  Yeah.

2      **THE COURT:**  So if you all move, and you all can get

3  me the documents -- if you're not pleading, get me the motions

4  before a particular time, go ahead and do it.

5      And then I got a joint motion.  And then the next thing

6  that happened is Mr. Masood files two motions.

7      **MR. GOROKHOV:**  Right.

8      **THE COURT:**  So I took from that, that we were going.

9      **MR. GOROKHOV:**  Right.

10      **THE COURT:**  And then I think I then had a

11  conversation with counsel about setting a real trial schedule,

12  which is this one.

13      So the plea negotiations seemed to have ended, according

14  to the docket, in the beginning of the year.

15      Government, do you have something different in your

16  chronology?

17      **MR. GARDNER:**  No, Your Honor, that's essentially

18  correct.

19      **THE COURT:**  Okay.  So even if I assume, and I'm

20  not -- even if I could find some legal authority for plea

21  negotiations somehow affect these obligations, it still means

22  that as of January 2023, negotiations were over.

23      That's how I see the docket.  Because I think it was at

24  ECF 130, there was a joint motion to extend dates.  And it was

25  put in that motion to me the reason why you wanted some more

1    time -- and I know you weren't there yet, Mr. Gardner, but your

2    predecessor counsel said the reason why -- why we want more

3    time because we're trying to work it out.  And that's at

4    ECF 130.  Okay?

5        And that was filed by Mr. Masood's predecessor counsel.

6        My response was, I'm not just doing it for you, and that's

7    at ECF 131.  I denied the request.

8        And I said, you know, it would -- it would throw the

9    current motions hearing, which we had as January 5, it would

10   make it impossible, please get on the same page and work out

11   the date that would still keep that date.

12       And you all did that, and I granted that motion at 132.

13   Right?

14       And then in short order, 12/4/2023, and I get two motions

15   from Mr. Masood, which means they give us a little more time to

16   work this out, didn't result in a plea agreement.  And I took

17   that to mean we were going, right?

18       So then we have a call 12/15, and I believe we set the

19   scheduling order at 167 -- well, maybe not from that call.

20   We -- eventually, we do set a scheduling order on April 1.  And

21   we set for trial to begin in July.  So obviously no plea

22   agreement at that juncture.

23       And then I amend the pretrial scheduling order when it's

24   really clear, because I think that there was some whiff of

25   maybe this will work out.  When it was really clear that this

1    was not going to resolve in May, I set the September date.

2          **MR. GARDNER:**  Your Honor, up until three weeks ago,

3    there were active discussions about a plea, including specific

4    numbers of restitution that would be provided at sentencing.

5    So this -- your two tracks were absolutely happening, Your

6    Honor.

7          **THE COURT:**  Yeah, I understand that.  It happens all

8    the time.  It's part of doing business in the big city.

9          **MR. GARDNER:**  Understood, Your Honor.

10         **THE COURT:**  That -- I mean, so that doesn't -- that's

11   not mitigation, though.

12         **MR. GARDNER:**  I understand, Your Honor.  I'm merely

13   answering the Court's question about it appears this kind of --

14   it's showing culled, and I'm saying that's actually not the

15   case, for whatever it's worth.

16         **THE COURT:**  Yeah.  Okay.  Got it.

17       So you're saying, listen, Judge, accept as a fact, we were

18   constantly negotiating, and the legal significance, that's a

19   separate issue, am I getting that right?  That, basically,

20   we're always negotiating, and the question is really what's the

21   legal significance.

22       You want -- you want me to sort of credit that there's

23   some legal relevance to while those negotiations were going on,

24   defense never made another Rule 16 request, even though they

25   had already made it, preserved it, were told it was coming.

1  It's the government's position that, hey, if you're going to

2  continue plea negotiations, then you should -- you should

3  resurrect your requests.

4      I'll hear from the defense on that in a minute.  But

5  that's how I'm hearing the argument.

6      So we did *Brady*.  We did Rule 16.  That leaves the

7  government -- the defense has raised *Giglio* as well.

8      Do you want to address *Giglio*?

9          **MR. GARDNER:**  I will, Your Honor.  I want to briefly

10  just comment on Rule 16.

11          **THE COURT:**  Sure.

12          **MR. GARDNER:**  I think, of course, there is the

13  sense -- we certainly don't know what's going to be relevant to

14  the defense.  And that's why they are obligated to have these

15  things.  What is Rule 16 to us, is not Rule 16 to them.  That's

16  sort of a truism.

17          **THE COURT:**  Right.

18          **MR. GARDNER:**  In that sense, not giving them the

19  opportunity to look through it was the violation of Rule 16.

20  But to date, I don't think there's been any representation that

21  any of it actually was -- has been material to the defense, or

22  basically --

23          **THE COURT:**  How do they know that if they don't get

24  it?  They got to come to me now?  You -- they make the request.

25  You don't honor the request.  You tell the Court why.  Okay.

107

1    But bottom line is, you don't honor it.  Now they got to come

2    up with what they think would have been on the codefendants'

3    cell phones when you never gave them?

4        I mean, they -- see, I think the violation is just so

5    broad and so basic that it's hard to get behind that.  You

6    know, how it would be that without more, you know,

7    fact-specific proffers.

8        But what else -- maybe you got something more specific in

9    mind you want to share.

10            **MR. GARDNER:**  Your Honor, I think I will -- there was

11   a -- a significant quantity of materials that were produced.

12   And I think the ones that weren't initially produced as Rule 16

13   were partially because of the privilege issues that I had

14   mentioned.

15            **THE COURT:**  Okay.

16            **MR. GARDNER:**  So what was produced -- and, again, I

17   want to be clear throughout this, the government has not found

18   any of this relevant to it, to the government, right?

19        So none of this information is intended to be used by the

20   government at all.  I understand that now it is the defense to

21   look to see if they actually find it relevant.  But I sort of

22   think it is a mitigating factor that none of this is going to

23   be introduced as a surprise to the defendant.

24            **THE COURT:**  Okay.  What was produced?

25            **MR. GARDNER:**  Well, the defendants' devices were

1  produced, or were returned.  And then, basically, I mean, now

2  the defense has -- has the exhibit list, which --

3       **THE COURT:**  Well, what was produced in discovery that

4  caused you to walk back from talking to Mr.-- sorry --

5  Manthripragada, I want to get it right.  Okay?

6       What was produced that you haven't already put on the

7  record that you say mitigates the Rule 16 and *Brady* violations?

8  What specifically?  You put on the record the Walter Reed

9  e-mails, the Infused e-mails, and the HMA e-mail account.  What

10 else?

11      **MR. GARDNER:**  Well, I mean, as long as the record is

12 clear that the defendants' devices, to the extent --

13      **THE COURT:**  I don't know if they have or haven't.  I

14 told you, I'm not accepting that as a fact until I get the

15 chain of custody, which is on the slowest pony from wherever it

16 lives.  I mean, it really -- like, where is it?

17      **MR. MANTHRIPRAGADA:**  Your Honor, if I may address the

18 Court?

19      **THE COURT:**  Yes.

20      **MR. MANTHRIPRAGADA:**  If we could receive the link

21 from the Court, we could directly upload it to the same site

22 where the Court received the earlier documents.  The agent is

23 sitting right outside with his laptop.  We can certainly see,

24 we can put that on the --

25      **THE COURT:**  Have you produced them to the defense?

109

1  Because you can also just e-mail them to Mr. Ulander.  We can

2  take a -- I have to take a break at 1:00, because I have a

3  hearing -- a meeting that I have to go to.

4      So feel free to e-mail them to defense counsel and to

5  Mr. Ulander, and we'll take a look at them.  Okay?

6              **MR. MANTHRIPRAGADA:**  May I step outside?

7              **THE COURT:**  Yeah, of course.

8              **MR. MANTHRIPRAGADA:**  Thank you.

9              **THE COURT:**  Okay.  So assuming the chain of custody

10  squares up that these devices were returned, defense, do you

11  know anything about this?

12              **MR. GOROKHOV:**  We assume that -- we can, I think,

13  assume that they were returned.  We'll check with Mr. Masood

14  again.

15      But, again, that doesn't solve our problem, which is we

16  want the other devices.

17              **THE COURT:**  Right.  No, I understand.  I just want to

18  sort of -- I wasn't going to accept --

19              **MR. GOROKHOV:**  To be fair, Your Honor, I don't think

20  that's going to be a major -- I'm frustrated, also, because the

21  chains of custody that were sent to us aren't actually --

22              **THE COURT:**  Sure, they were not the full chains of

23  custody.

24              **MR. GOROKHOV:**  Yeah.  Yeah.

25      But, no -- just to cut to the chase, I don't think that's

1     going to be the major issue for us.  But anyway, I'll address

2     the Court once my colleague is done.

3            **THE COURT:**  All right.  So the devices were returned,

4     Mr. Masood's?

5            **MR. GOROKHOV:**  That's our understanding.

6            **THE COURT:**  Okay.  All right.  Very good.  So then,

7     go ahead.  Let's assume that to be true.

8            **MR. GARDNER:**  So the only other two things that I

9     think are relevant, and devices were -- devices were returned,

10    and then there -- there -- the lack of followup regarding the

11    other devices, I think, does -- it is relevant.  It is not in

12    any way dispositive, I do think it is relevant.

13         Also relevant, there -- there could have been attempts,

14    even despite the privilege, if they were that important, to

15    seek, you know, legal ways to get at the devices of

16    codefendants if it was, for example, you know, going to trial

17    at some point, or it looked like the information would be

18    relevant.

19           **THE COURT:**  So what are you saying?  How do you get

20    to the codefendants' devices other than ask in discovery, which

21    they did?  What else do you do?

22           **MR. GARDNER:**  Your Honor, I understand there was the

23    potential for a Rule 17 motion to get at those devices.

24           **THE COURT:**  Can't do that.  Can't do that.  Because

25    the witness -- she's a witness.  They are witnesses.  So you --

1    I don't think that Rule 17 is permissible against a witness.

2    And they are clearly going to be witnesses if not codefendants,

3    so Rule 17 doesn't work.  That's why we have discovery

4    requests.  So I don't think that would do it.

5         **MR. GOROKHOV:**  And I would add, Your Honor, that I

6    don't believe that getting the device from a person who's

7    already pled guilty and knows they're going to testify and has

8    the device in their house, and, you know, God knows what they

9    are doing with it.

10        **THE COURT:**  Well, that's true, it's out of -- yeah,

11   that's a nonstarter.  Okay.  Go ahead.

12        **MR. GARDNER:**  Your Honor, that's -- that's basically

13   what we have in terms of the context.  I think it is relevant

14   to understand the context, and that is, again, going to the

15   remedy, and that all goes to the -- the egregiousness of the

16   violation which we sort of conceded.

17      The Court has set out different levels of the violations,

18   and I just am -- provided context to sort of move us somewhere

19   along that spectrum.

20        **THE COURT:**  Yeah.

21        **MR. GARDNER:**  But I agree to that concession that

22   violations were made, Your Honor.

23        **THE COURT:**  And since the government has not -- if

24   I'm getting it right, you -- you, as the prosecuting attorneys,

25   as the ones responsible for the case now, have not reviewed the

 1  contents of those devices?  Am I right?

 2          **MR. GOROKHOV:**  No, Your Honor.  And I do want to be

 3  clear that potentially -- also -- also in mitigation, it is not

 4  like they were -- they were dismissed out of whole cloth.  They

 5  were reviewed, and if we say it was a cursory review, or it was

 6  an incomplete review, I do think it's relevant that an attempt

 7  was made to review the documents that were -- that were --

 8          **THE COURT:**  Well, I just -- I kind of want to take it

 9  step by step.

10      You have not personally reviewed them, right?

11          **MR. GARDNER:**  Your Honor, I have not.

12          **THE COURT:**  Okay.  And to your knowledge, I don't

13  think Mr. Manthripragada has either, right?

14          **MR. GARDNER:**  He has not.  It was --

15          **THE COURT:**  Okay.  All right.  And then so then

16  you're relying on the representations of your predecessor

17  counsel, right?

18          **MR. GARDNER:**  Yes, Your Honor.

19          **THE COURT:**  And I don't believe he had co-counsel.

20  If he did, I didn't know about co-counsel.

21          **MR. GARDNER:**  At a certain point, Rajeev was -- I

22  can't pronounce his last name, Raghavan, was also co-counsel in

23  this case, but I don't know the time frame.

24          **THE COURT:**  Who left -- who left quite some time ago.

25      And you've had no contact with Mr. Raghavan, right?

1          **MR. GARDNER:**  No.

2          **THE COURT:**  So the representations are from Mr. Ake

3    only, and where we started much earlier in the day was, you

4    really don't know what he reviewed when.  At best, the record

5    suggests he reviewed only those subsets, small subset of

6    objects that were released post initial word search for taints.

7    I mean, there's just -- there's no way I can plausibly believe

8    that Mr. Ake, in a very short period of time, without more,

9    went through 460,000 objects, it's just hard for me to accept

10   that.

11         **MR. GARDNER:**  I think that's a fair assumption, Your

12   Honor.

13         **THE COURT:**  Okay.  So -- so we really don't know.  I

14   mean, the bottom line is, you can't say to me that what has

15   been -- as a factual matter, you don't have personal knowledge,

16   that, listen, what we gave back to Mr. Masood, it doesn't have

17   *Brady*, and it's very probative, so that's -- they already have

18   that, right?  I mean, you're saying it's a fair assumption,

19   because if he's on these devices, then presumably, there would

20   be relevant evidence.  But it's a presumption.  I don't have

21   any evidence of that.

22         **MR. GARDNER:**  Your Honor, I think it's -- it's -- the

23   presumption is sort of strengthened.  We do have a subset that

24   would have included, I think, the most relevant terms.

25   Presumably, we wanted to find helpful information to the

1   government.  And that would have included things that were not

2   helpful, based on the same sort of universe of documents.

3           **THE COURT:**  But I thought the search terms had to do

4   with privilege?

5           **MR. GARDNER:**  That's -- that's right, Your Honor.

6           **THE COURT:**  So those would not be necessarily

7   relevant, maybe, maybe not.  They would have lawyer, legal

8   privilege, confidential, right?

9           **MR. GARDNER:**  I'll be more targeted.

10      The items that would have been reviewed by Mr. Ake, and

11  sort of focused on, would have been the same universe of

12  documents, I think.  I'm just going to the thoroughness of a

13  review of the remaining documents that were -- that were

14  culled.

15          **THE COURT:**  So you're saying the subset of the

16  subset?

17          **MR. GARDNER:**  Would have been the most relevant

18  documents to both sides.

19          **THE COURT:**  Why do you say that?  What basis do you

20  have to say that?  The subset of the subset had just to do with

21  privilege review for, like, is it attorney-client confidential

22  communications or work product?

23      So why would I make the assumption that when Mr. Ake looks

24  at those documents that the taint team says of that subset,

25  they are not privileged, why am I assuming that they are the

1  most critical documents?

2          **MR. GARDNER:**  Your Honor, I think I meant within that

3  subset.  Basically, it increases the likelihood that he would

4  have found *Brady* in the materials that he was looking for.

5          **THE COURT:**  But the subset is 34,000 objects.

6  There's 466,000 documents that were never reviewed.  I can't --

7  I can't -- I can't make that inference.

8      But I hear what you're saying.

9      Okay.

10          **MR. GARDNER:**  Your Honor?

11          **THE COURT:**  Yeah, go ahead.

12          **MR. GARDNER:**  So I think there's -- there's --

13  there's that point, again, because this all is going to remedy,

14  I think it is also relevant to the -- sort of the likelihood of

15  *Brady* material.

16      Now, we're, of course, speculating, but a similar -- we

17  have not found any *Brady* material in any of the documents we

18  have produced, and we -- we think that the defendant -- because

19  the defense has their own device, and presumably, knows

20  incoming e-mails from individuals and has basically presumably

21  reviewed their own documents, their own data, they would have

22  been, maybe, more targeted in their -- they certainly don't

23  have any reservations about filings with the Court.  And I

24  think they would have been very targeted in what they were

25  looking for.

1          **THE COURT:**  They don't have to be, although they can

2    make a more robust proffer of prejudice, which they might do,

3    but we'll see.

4       Mr. Gorokhov?

5          **MR. GOROKHOV:**  Yes, Your Honor, if I maybe just jump

6    in here for a second.

7          **THE COURT:**  Yeah.  Let me make sure -- is there

8    anything else, Mr. Gardner, that you want me to know before I

9    turn to the defense?  They have been pretty quiet about what

10   they have and haven't done, so in fairness, I want to turn to

11   them.

12         **MR. GARDNER:**  That's fair, Your Honor.  I don't have

13   anything else except to say if we're talking remedies, the

14   government believes the appropriate remedy at this point, now

15   that we are ready to produce basically everything today and

16   start the review, is a continuance rather than any sort of

17   sanction against the -- basically the rule of law and

18   suppression of evidence, which, you know, would be an overly

19   heavy sanction in this case.

20         **THE COURT:**  Okay.  All right.  Thanks.

21      Mr. Gorokhov?

22         **MR. GOROKHOV:**  Your Honor, I'll be very brief.  And I

23   believe my colleague, Mr. Greenberg, is going to have some -- a

24   few points.

25      But I think for the first thing I just want to say related

1   to the Rule 16 is I can represent to this Court that we have

2   found *Brady* and *Giglio* all over the Rule 16 materials that the

3   government has provided to us.  Now, I can bet --

4           **THE COURT:**  Okay.  Hold on.  Let's stop there,

5   because that's important.

6           **MR. GOROKHOV:**  Yeah, yeah.

7           **THE COURT:**  You're saying the Rule 16 that has been

8   provided?

9           **MR. GOROKHOV:**  Right.

10          **THE COURT:**  You have found *Brady* and *Giglio*?

11          **MR. GOROKHOV:**  Yes.

12          **THE COURT:**  Do you want to give me a --

13          **MR. GOROKHOV:**  Interview reports, for example, that

14  contained government witnesses lying and being caught lying;

15  reports that contained --

16          **THE COURT:**  Folks on this list that you have ROIs of,

17  the witness list for the government?

18          **MR. GOROKHOV:**  That list, I can't, off the top of

19  my -- honestly, Your Honor, I was focused on other things last

20  night, so I'm not -- yeah, Marlon Johnson.

21          **THE COURT:**  Yeah, he's on here.

22          **MR. GOROKHOV:**  Peebles.  All those people, right?

23          **THE COURT:**  Okay.  All right.  That's your *Giglio*.

24          **MR. GOROKHOV:**  Yeah.  So I think what I'm saying to

25  you, Your Honor, is that that's a part of *Giglio*.  I think if

1  the government looked at a lot of those reports, their position

2  would be this is highly incriminating for Mr. Masood, right?

3  We look at those reports and we say this is highly exculpatory.

4      So I do not trust for one second -- I would never put

5  anything on the line of trusting Mr. Ake to know what

6  constitutes *Brady* or *Giglio* if it hit him in the face.  Like, I

7  would never, ever outsource --

8      **THE COURT:**  But can you speak to the one area that --

9  listen, this is all extremely troubling.

10      **MR. GOROKHOV:**  Yeah.

11      **THE COURT:**  You know, one question I have is, what's

12  sort of the internal U.S. Attorney's policy when there is

13  confessed *Brady* violations?

14      But assuming I am put to the task of deciding what the

15  remedy is, can you -- and not -- not necessarily this moment,

16  because we're just -- we're digesting all of this, but can you

17  proffer to me what is squarely *Brady* that you have found, which

18  suggests the government's lack of diligence in this regard is

19  prejudicial?  Or, alternatively, do you believe that for this

20  kind of violation, you don't have that burden?  I'm trying to

21  sort out what the law is and what the record is.

22      **MR. GOROKHOV:**  Your Honor, I don't believe we have

23  that burden.  I don't believe we have that burden.

24      **THE COURT:**  Pretrial, don't you have to show some

25  prejudice, though, that -- because, like, usually *Brady*

1  violations come up after trial, right?  Not as -- defense

2  attorney is not as diligent as you.  You find out later that

3  this whole tranche of discovery was kept.  And then you've got

4  a trial record where it's often very clear what the prejudice

5  is.

6      MR. GOROKHOV:  Yeah.  Well, where we are right now,

7  Your Honor, for example, is like we know, as we stand here

8  today, that Michelle Peebles had several proffers with the

9  government, and one of them hasn't been provided, as we stand

10 here today.

11     Like, this is a central witness to the government who

12 engaged in a stunning series of crimes.  She's been slapped on

13 the wrist for them.  And we don't all -- have all of her

14 proffers.

15     We also have indications that there was questioning that

16 was conducted by the IRS, was it on Harriett -- Harriett.

17 There was questions being conducted by IRS where the government

18 has provided us a report from Agent Kimrey that says -- because

19 at one point, IRS came into this case and started doing a lot

20 of investigating and generating a lot of material.  We have

21 very little IRS material.

22     THE COURT:  Got it.

23     MR. GOROKHOV:  In fact, the report says, at this

24 point the IRS agent started to lead the questioning.  And cuts

25 off.

```
 1          THE COURT:  Of Ms. Peebles, you said?

 2          MR. GOROKHOV:  Of Ms. Jackson.

 3          THE COURT:  Ms. Jackson.  Okay.

 4          MR. GOROKHOV:  Ms. Jackson.

 5      So those are just two examples.

 6      I think the question we need to ask, Your Honor, just

 7  going back to first principles, and I know Mr. Greenberg has a

 8  lot more potentially to say on this, but just going back to

 9  first principles, and just fundamental fairness, and, you know,

10  the language from Berger and all of that, how can the

11  government be confident that they are going to trial against a

12  guilty man, when they haven't looked at 400,000 --

13          THE COURT:  Well, one thing I want to make sure I

14  understand is what this theory of the case is, frankly, because

15  the indictment is thin, the superseding indictment is thin.

16          MR. GOROKHOV:  Yeah.

17          THE COURT:  And I still -- I don't know if I fully

18  understand what the thrust of the fraud is.

19          MR. GOROKHOV:  Right.

20          THE COURT:  Because if I'm getting it right, I think,

21  but is it the invoices were submitted for work actually

22  performed, so the victim got the work performed --

23          MR. GOROKHOV:  Right.

24          THE COURT:  -- but not by the person who they thought

25  they got the work performed for?
```

1          **MR. GOROKHOV:**  That's right.

2      What it is, Your Honor, it's a business dispute, it's an

3  allegation that one company cheated another company,

4  essentially a self-dealing kind of thing that probably wouldn't

5  even be criminalized under the current state of wire fraud law.

6  But it's masquerading as a healthcare fraud against the

7  government.

8      In fact, supposedly, against the healthcare benefit plan,

9  which Walter Reed is not.

10          **THE COURT:**  Right.

11          **MR. GOROKHOV:**  But -- so it's a very convoluted

12  theory that they spun up from Mr. Johnson's problems with our

13  client into a federal case of health care fraud.

14          **THE COURT:**  So there's Walter Reed, there's Infused.

15  Infused had the contract with Walter Reed.

16          **MR. GOROKHOV:**  Correct.

17          **THE COURT:**  Infused legitimately subcontracted out

18  certain services, right?

19          **MR. GOROKHOV:**  They independently contracted out to

20  HMA, to this entity HMA.  And then what happened was, Harriett

21  and Michelle went out and essentially stole the identities of

22  individuals who were close to them and used those individuals'

23  identities to bill under while they were doing -- while, I

24  believe, it was Michelle was performing the work.

25      And then actually Infused made money on these -- on this

1  business, because Infused kept part of the profit of what was

2  billed.  So the guy who is accusing my client is actually a

3  beneficiary of this billing to the government.

4        **THE COURT:**  But the thrust of the fraud is that

5  individuals who were not coders --

6        **MR. GOROKHOV:**  Correct.

7        **THE COURT:**  -- official coders --

8        **MR. GOROKHOV:**  Yeah.

9        **THE COURT:**  -- did the work and made it look like

10 they were doing it on behalf of official coders --

11       **MR. GOROKHOV:**  Right.

12       **THE COURT:**  -- and then that was billed to Walter

13 Reed?

14       **MR. GOROKHOV:**  Ultimately, through Infused, who had

15 the contract with Walter Reed.

16    Here's the issue, Your Honor.  All of the evidence -- and

17 I would say this case is unusual, as we know from the past

18 two -- almost three hours, is highly unusual in my ways.  But

19 one of the things is like the -- every single instance of

20 conduct goes back to somebody else.

21    So the government's case against Mr. Masood, I will say

22 now, is highly circumstantial.  So if there's one text message

23 in Michelle's phone to Harriett saying, "That dummy Masood, you

24 know, just don't tell him," that one text message is the end of

25 the government's case, right?

1       And we have 400,000-plus items that have never been

2  reviewed.

3       So our problem, Your Honor, is we're kind of also in a

4  Hobson's choice where it's not fair that we didn't get it, but

5  it's also not fair that we're not able to access it.  It's --

6  we lose both ways, quite frankly.

7       I'm sorry, Mr. Greenberg has been chomping at the bit.

8       **THE COURT:**  Sure.  Sure.  Yep, because then I got to

9  break.

10      **MR. GREENBERG:**  Judge, I think I'll be relatively

11 brief.  If I may have leave to speak, I haven't yet entered my

12 appearance, but will do so today.

13      **THE COURT:**  Sure.  Yes.  No problem.

14      **MR. GREENBERG:**  Judge, you asked earlier if you

15 exclude Jackson, Peebles, why does Mr. Masood need to get

16 internal communications from the government?  And I just want

17 to respond to that question a little bit more.

18      Your Honor correctly pointed out what Your Honor -- to the

19 government something to the effect of, your case is in a lot of

20 hot water, and just based on *Brady* and *Giglio* and Rule 16, I

21 don't think we need to get to prosecutorial misconduct, I don't

22 think we need to get there, something to that effect.

23      **THE COURT:**  Yes.

24      **MR. GREENBERG:**  So putting aside any issues of

25 prosecutorial misconduct, the internal communications are

1  relevant on this issue of so-called mitigation or prejudice.

2  And the reason they are relevant is that the 18 electronic

3  devices, if I've got my number -- may be 17 electronic devices

4  that were collectively returned apparently to Jackson, Peebles,

5  those 17 devices don't only have communications with Jackson,

6  Peebles, and Mr. Masood.  There is other people on those

7  communications.  That's a matter of commonsense.  And it's also

8  commonsense there are other witnesses on the government's list

9  that are in those communications.

10     Excluding Jackson and Peebles is not a sufficient remedy,

11  because Mr. Masood's counsel now are unable to use the 466,000

12  documents that Your Honor correctly observed, you know, may

13  contain critical *Brady* information, Rule 16 information.

14  Defense counsel can't use those to cross examine all of the

15  other witnesses who are on those electronic communications.

16          **THE COURT:**  Well, you do, you just have nine days to

17  do it.

18          **MR. GREENBERG:**  Well, actually, respectfully, it's

19  impossible.  Because even if we could review the documents that

20  fast, and even if --

21          **THE COURT:**  Yeah, you couldn't do anything.

22          **MR. GREENBERG:**  Yesterday, as Your Honor correctly

23  pointed out, because they're codefendants who got their devices

24  back, the chain of custody is broken.

25          **THE COURT:**  But they imaged the device -- my

1  understanding is, the data still exists.  It exists and it was

2  uploaded to Relativity, and so there's a platform,

3  theoretically, where you could get access tonight.  Let's just

4  assume that, for the sake of argument.  What does that do to

5  the prejudice?

6       **MR. GREENBERG:**  Okay.  Well, I did not understand

7  that to be the case.  But if that's the case, that is different

8  in terms of the chain of custody, assuming we get a full chain

9  of custody records, which I guess we're still waiting for.

10      **THE COURT:**  So assume -- because I think what we're

11 going to hear in the end is that the devices themselves were

12 all returned to each of the respective codefendants but the

13 data was imaged and uploaded into Relativity.

14     Now, that still leaves a lot of daylight, in my view, as

15 to what you need to do to get ready for trial, but it's not the

16 same as assuming the only way you get to the information is

17 through the devices returned to Jackson and Peebles.

18      **MR. GREENBERG:**  Well, but even if the data was

19 uploaded and imaged, which, you know, I was not aware of, and I

20 don't know if that is accurate.  How do we know that all of the

21 data was up loaded and imaged, and how can we verify that when

22 the devices have been returned to the co-conspirators?

23      **THE COURT:**  I understand that.  That's sort of my

24 point, is it's a huge lift between now and next Tuesday.  It's

25 a lift that would have taken, you know, defense attorneys quite

1  some time to unravel.  And then you have to go through it,

2  so -- and then you have to do your investigation.

3       So I'm still, you know --

4       **MR. GREENBERG:**  I think it may actually be worse than

5  that.  I think it may be analogous to a spoliation or reckless

6  destruction of evidence situation.  Because the devices have

7  been given, two people have pled guilty, presumably are

8  cooperating, and have a very strong incentive to withhold

9  materials, fabricate stories to get a lot shorter sentence, how

10  do we know that all the information, all the *Brady* that the

11  government is -- and the Rule 16 and *Brady* violations by the

12  government, how do we know -- assuming there was this imaging

13  done, how do we know that everything on the devices actually

14  was captured?  We don't know.

15       **THE COURT:**  It's based on the agent's word and the

16  tech's word, whoever is the tech person that actually did it.

17       **MR. GREENBERG:**  But there's no way to verify that.

18  We can't possibly verify that.

19       **THE COURT:**  You know, there's -- often, though,

20  there's like -- there are reports that can be generated.  There

21  are Cellebrite reports that show -- like, the actual software

22  that they use to get in and get everything all of the phone and

23  upload it to another database usually has a paper trail.

24       But to your point, you don't have that.  And so I'm not

25  really sure you need the device to be able to challenge the --

1   the reliability of the download of information.  But you don't

2   even have, if I'm understanding it right, not like scrap one

3   about how the 27 devices were imaged, extracted, and

4   downloaded, right?

5           **MR. GREENBERG:**  Well, I'm not sure I heard the

6   entirety of the question.  But I think if I heard it

7   correctly -- I mean, my understanding, and I think this is

8   responsive -- my understanding is that the government has not

9   produced a single report --

10          **THE COURT:**  Right.

11          **MR. GREENBERG:**  -- with respect to the imaging, and

12  the uploading, and et cetera.  So there's just no information.

13          **THE COURT:**  Correct.  You don't know it.  You don't

14  have it.

15          **MR. GREENBERG:**  Right.

16     And so it's -- I mean, to me, it's analogous to a

17  spoliation or reckless destruction of evidence situation.  And

18  it's incurable.  It's an incurable problem.

19          **THE COURT:**  Well, it's curable, but it would require

20  you to agree to a continuance of the trial.

21          **MR. GREENBERG:**  No.  Respectfully, it's not curable,

22  because the devices are now in the hands of people who have

23  pled guilty and have an interest to get shorter sentences and

24  lie.

25          **THE COURT:**  I'm not totally there with you.  I think

1  it would have to be that you have an opportunity to look at

2  whatever evidence there is documenting how and what information

3  was taken off every given device, and how and what it was

4  imaged to, and then how it was put into the database.

5      Do you see what I'm saying?

6      Like, there's an electronic chain of custody.  In a

7  perfect world, if there were months between now and trial, you

8  could be given that and you could investigate it.  But I don't

9  think that's the way trial is supposed to work.  I don't think

10  it's like we just move the goal post every time there's a huge

11  discovery violation.

12      **MR. GREENBERG:**  Right.  I mean, at some point there

13  has to be serious consequences, when we're told this is not a

14  document-intensive case, but there are 466,000 electronic

15  documents we didn't bother to review for *Brady* or Rule 16.  We

16  made a decision not to review that, we have heard was admitted

17  today.

18      **THE COURT:**  Right.

19      **MR. GREENBERG:**  And there needs to be some

20  consequence.

21      And ordering the government to produce all electronic, all

22  communications related to the devices, that would shed more --

23  likely shed more light on the extent of the prejudice, which --

24  you know, and whether it's in -- whether it's curable.  There

25  are likely to be conversations, like, you know, why are we --

1   what are we doing with these devices?  Why are we, you know,

2   giving them back to the codefendants?  Why aren't we reviewing

3   these hundreds of thousands of electronic communications?

4       If I understand correctly, if I heard correctly today,

5   only e-mails have been produced, no text messages, no WhatsApp

6   messages, no other electronic communications.

7           **THE COURT:**  No documents that are kept on computers.

8   I mean, there's just nothing, right?  I mean, I don't know -- I

9   took -- I did a quick review of the exhibits, and I have no

10  idea what the sources of these exhibits are.  And that could be

11  its own can of worms, because, you know, we haven't talked

12  about this yet, we'll talk about it when we get back, but

13  you've conceded -- you're asking me to deny the motion to

14  suppress as moot, but that's assuming that none of the

15  documents on the witness list -- on the exhibit list are

16  derivatively obtained.  Like, I got to know where the documents

17  on your list came from to know whether it's really moot, and

18  I'm probably not just going to have a "take our word for it."

19  We may not get there.  Because I just -- we may not get there.

20  I have to think about this.

21      Okay.  Anything else, Mr. Greenberg?

22          **MR. GREENBERG:**  Well, your Honor, I guess just to

23  make clear we are -- and we can supplement this with a brief,

24  you know, ask -- respectfully request the Court order the

25  government to produce all of those internal communications

1  related to these devices so that we can ferret out the extent

2  of the prejudice, and see if there's any way to mitigate it,

3  which to me seems impossible.

4          **THE COURT:**  You mean between now and next Monday or

5  Tuesday, when we're picking a jury?

6          **MR. GREENBERG:**  Look, I mean, this is a problem the

7  government created.

8          **THE COURT:**  Well, no, I understand that.  I'm not

9  saying -- no, I'll order it, but I was thinking, I need

10  briefing by Monday, Tuesday, on the *Brady* -- the conceded *Brady*

11  and Rule 16 violations.  So we only have so many hours in the

12  day.

13          **MR. GREENBERG:**  I mean -- right.

14          **THE COURT:**  You have to help me make a decision

15  before I put a jury in the box.

16          **MR. GREENBERG:**  Well, we heard from the government,

17  the government -- not only are there Rule 16 and *Brady*

18  violations, they admitted repeatedly, they used the word

19  egregious.  So under these circumstances, I don't know that we

20  need briefing.  I think the Court could order it right now and

21  would be entirely justified in doing it.  We don't need to have

22  a briefing.

23          **THE COURT:**  No, I'm asking -- I'm asking why am I

24  ordering disclosure now if right now there is confessed Rule 16

25  and *Brady*?  Do you see what I'm saying?

1    I think maybe what you're saying is, well, Judge, if

2  you're at all worried about the prejudice, let us have that,

3  too, so we can show you how prejudiced we have been.  Is that

4  kind of it?

5          MR. GREENBERG:  That's -- yes, yes.

6          THE COURT:  I see what you're saying.  Okay.  All

7  right.

8    Counsel, I got to do this call.  Let's return back here at

9  2:00.

10          MR. GREENBERG:  Can I make one other --

11          THE COURT:  Sure.

12          MR. GREENBERG:  It would be like a sentence.

13          THE COURT:  Of course.

14          MR. GREENBERG:  We would ask the government produce

15  the various iterations of search terms that were used during

16  this tainting review and the culling process that were used to

17  narrow.  Because I suspect that none of them, or very few of

18  them, at most, is going to have any bearing on Rule 16 or *Brady*

19  or *Giglio.*

20          THE COURT:  So sort of rebut this notion that they

21  were really critical documents?

22          MR. GREENBERG:  Yes.

23          THE COURT:  Yeah, I got to tell you, like, I just

24  commonsensically, like if you're doing a taint team review, and

25  34 -- what did I do?  Sorry about that.

1    If you're doing a taint team review, that the search terms

2    are not going to be relevant to the case.  They are going to be

3    relevant to an attorney invoking privilege.

4    But I hear you.

5    Why don't we do this?  Let's take a break.  At 2:00, maybe

6    you all can gather what your -- your asks are, we can talk

7    about the remaining motions, and I think some sort of briefing

8    schedule is going to be in order.

9    Okay?  And it's going to be quick.  I mean, it will be

10   quick.  It will be like -- because I want to decide this before

11   we're supposed to be meeting for trial.

12   All right.  Thank you.

13        **DEPUTY CLERK:**  All rise.  This Honorable Court now

14   stands in recess.

15   (Recess taken at 12:57 p.m. until 2:10 p.m.)

16        **DEPUTY CLERK:**  All rise.  This Honorable Court now

17   resumes in session.

18        **THE COURT:**  All right, counsel.  You all can have a

19   seat.

20   I did receive the -- the subsequent chain of custody

21   documents from -- I'm sorry.  Hold on one sec.

22   Okay.  I received the documents.  I take it you have as

23   well, defense?

24        **MR. GOLDMAN:**  We just received those, and we just had

25   a conversation, I just wanted to put that on the record as

 1  well.

 2              THE COURT:  Sure.  Of course.  Yep.

 3              MR. GOLDMAN:  The chain of custody documents that

 4  were just provided go through -- and I haven't confirmed

 5  everything, but it appears that they go through the return of

 6  the devices.  There are separate chain of custody documents

 7  that are now being pulled from the cloud that pertain to the

 8  drives.

 9      There's apparently one -- you know, one drive -- the

10  imaged drive for each of the devices.

11              THE COURT:  Okay.

12              MR. GOLDMAN:  Those are being done.  And forensic

13  reports are also not included in this.

14      So this is just the return -- through the return of the

15  devices.  The drives themselves are separate items, separate

16  forensic reports, and separate chains of custody that are not

17  included in here, but we're told are being provided.

18              THE COURT:  Okay.  All right.  Anything else that

19  either side wants to put on the record?

20              MR. GARDNER:  Your Honor, I have an unavoidable

21  family commitment at about -- I have to leave about 4:00.  And

22  if we get to that point, my co-counsel is ready to take over

23  for me, but I just wanted to put that -- make the Court aware.

24              THE COURT:  Okay.  Yeah.  I'm not sure -- so what I

25  did over the hour is sort of thinking about this and stepping

1    back a little bit, because we've spent many hours in the weeds,

2    and we continue, I think, to -- I want to resist that

3    temptation right now.

4        Because what I have in terms of a record is that the

5    government has, you know, confessed Rule 16 and *Brady*

6    violations that have to do with 17 electronic devices.  And I'm

7    not -- because I'm excluding Mr. Masood's just for a minute,

8    you know, and most favorably to the government, that were

9    seized, stored, imaged, but not reviewed for *Brady* and not

10    disclosed to the defense.

11        And we are nine days away from trial that everyone had

12    ample notice is coming, and these two witnesses are not

13    ancillary, they are critical.  That's what I know of.  If we

14    were all to drill down on the witness list, it would probably

15    get worse.

16        But I'm not sure -- I think -- I think where I am right

17    now is, I think both sides need to brief for me by Monday why

18    the case shouldn't be dismissed.  I mean, it's that serious,

19    it's that fundamental.

20        And any notion that the government could sort of, you

21    know, sidestep those fundamental obligations by saying, well,

22    we gave over -- we gave Mr. Masood his devices back, and it's

23    really up to the defense to find out what we should have found

24    when we looked, means, like, what's the point of *Brady* at all,

25    right?  You could avoid *Brady* by just imaging the devices and

1  giving them back and then you never have to look.

2      I mean, that really -- if you push that notion to its

3  logical extension, that means the government can always avoid

4  *Brady* by just giving everything back.  And I'm not sure that

5  the law works that way, but I'm not prepared to make such an

6  important decision, you know, today.

7      But I want to make it quickly, and I'm not sure that it

8  makes sense to spend too much more time on everything else

9  unless there's, you know, more you want me to consider between

10 now and Monday that you can't put in paper.

11     But that's -- that's how I see the evidence and, you know,

12 the -- and I got to say, you know, in addition to that, I don't

13 think I have to call it prosecutorial misconduct, but I'm very

14 concerned with how difficult it's been to get a straight story

15 on what happened with the government.

16     And that's not to say, you know, Mr. Gardner, you got into

17 this intending to mislead.  That's not what I'm saying.

18     But whether it be because you're overwhelmed or because,

19 you know, you're not given the support you need, it doesn't

20 really matter, like, you know, what they say, if I get punched

21 in the nose, whether you meant it or not, it still hurts.  So

22 it just means that from -- in the last five days, there have

23 been diametrically opposed government representations on these

24 critical issues that just have compounded the problem.

25     And I think that's perhaps material to whether -- what the

1  sanction ultimately is.

2      So that -- I want both sides to brief whether dismissal is

3  warranted.  That's number one.

4      And then number two, even if I were to say some sanction

5  short of dismissal is warranted, like barring Ms. Peebles and

6  Ms. Jackson from testifying, which is probably the -- on the

7  spectrum of sanctions, you know, that's -- I think that's in

8  the sweet spot.  And that's probably -- you know, there's

9  probably other witnesses that the defense could ask me for the

10  same remedy.

11      What does that -- you know, I want the government to think

12  about it.  What does that do to your case?  Like, what are we

13  doing?

14      If you don't have codefendant number two and number three

15  because of a square Rule 16 violation, that's just like you

16  were asked for the devices, for -- probably, if I counted it,

17  over a year, or close to it, to the two main witnesses who were

18  at, like, ground zero of this conspiracy, you didn't give it

19  over.  It's not just a couple of pieces of paper, it's 17

20  devices.  If I say listen, the sanction for that is you can't

21  call the witnesses, then what?

22           **MR. GARDNER:**  Did you want a response to that, Your

23  Honor?

24           **THE COURT:**  Yes.  Yep.  Whether you do it now, or you

25  do it in your pleadings, but I think that is sort of the

1    easiest, in my view, you know, what are we doing then?

2         And if it is, well, we have other witnesses who would fill

3    in the breach, then I need to know that, and I need to know who

4    they are.

5         Because, frankly, the last thing I'll say is that I

6    can't -- I can't presume regularity on anything in this case.

7    I can't presume that we've got a good -- you know, we got a

8    good chain of custody on anything -- any exivit that's in the

9    record, and that we really know what's happening in this case.

10        And, again, I'm not even -- I'm not casting aspersions.

11   I'm just trying to say it as it is.

12        You know, one of the exhibits from an e-mail exchange

13   between the two of you on Monday was the government saying

14   we're still doing witness interviews, some for the first time,

15   can't say whether we're using e-mails from the four categories

16   below because we don't know ourselves.  And we're nine days

17   away from trial.

18        So there's going to be no presumption of regularity or

19   benefit of the doubt in terms of what is left, right?

20        If I say, listen, at a minimum, the two custodians of

21   these devices that were never turned over will not be

22   testifying, I do need to know then what, from both sides?

23        Does that make sense?

24             **MR. MANTHRIPRAGADA:**  Yes, Your Honor.

25        May I address the Court briefly?

1          **THE COURT:**  Sure.

2          **MR. MANTHRIPRAGADA:**  Your Honor, obviously, we've had

3    a long, long day hearing.  We were on the record yesterday as

4    well.  So a lot of the information that's out there.

5          Some of the issues, as you can -- as you've heard, are

6    viewed in different ways.  We do need to be able to explain

7    some of them.

8          I guess the most important aspect of it, Your Honor, is

9    some of these allegations are very serious.  Some of the issues

10   that the Court is considering are very serious.

11         **THE COURT:**  Yep.

12         **MR. MANTHRIPRAGADA:**  I don't -- it's almost 2:15 on a

13   Friday.  To ask for a briefing where issues of such importance

14   are involved by Monday would be, I think, a challenge.  A part

15   of what we would need to do is involve our appellate people.

16   We would need a transcript of both yesterday and today.

17         **THE COURT:**  So what do you propose I do?  I've got a

18   trial date that I'm not going to move, right?  How am I

19   supposed to have the time to decide these important issues?

20         **MR. MANTHRIPRAGADA:**  Well, your Honor, the only thing

21   I can contribute is this, these issues appear to be issues that

22   are going to be -- that are going to dictate what happens with

23   the trial date.  I think one of the things the Court --

24         **THE COURT:**  No, not what happens with the trial date,

25   what happens with the trial, right?  I mean, you're not going

1  to propose to me I grant a continuance, right?

2          **MR. MANTHRIPRAGADA:**  Your Honor, one of the remedies

3  the Court does have is granting a continuance.

4          **THE COURT:**  Why would I ever do that?  Why would I --

5  you're going to have to explain to me why I wouldn't -- why

6  that wouldn't just set up more bad behavior to follow?

7          **MR. MANTHRIPRAGADA:**  Your Honor, I'm not saying

8  that's what -- I'm saying that the Court has that as an option.

9          **THE COURT:**  All right.  Okay.

10          **MR. MANTHRIPRAGADA:**  As far as these particular

11  issues are concerned, they are important enough, they deserve

12  to be briefed.  And we're not asking for a lengthy period of

13  time, just long enough to be able to secure the transcripts,

14  and to be able to frame our arguments appropriately, simply

15  because they will be supplementing everything that has already

16  transpired.  And giving the Court the framework on which to

17  make a decision.

18      So they are important enough, Your Honor, that I think

19  they deserve at least more than a weekend to pull it together.

20  That's all I'm asking of the Court's indulgence.

21          **THE COURT:**  Let me hear the defense on that.

22          **MR. MANTHRIPRAGADA:**  Yes, Your Honor.

23          **MR. GOLDMAN:**  Your Honor, we would be amenable to

24  making the briefing due Tuesday to give us one extra day,

25  hopefully to get the transcripts.

1    I wanted to just put a couple of other things on the

2  record about these items.

3    First of all, yesterday, the Court made a number of orders

4  orally during the course of that status hearing.  Many of those

5  orders were not complied with.  And I think there needs to be a

6  record of that.  So I would ask if the Court would prepare a

7  written order from yesterday, if -- if you prefer --

8         **THE COURT:**  Yeah, if you want to propose one, because

9  I know I ticked them off, and I'm not -- you know, I'm fine.

10  I'm open to you reviewing those and then saying to me this is

11  what you ordered, this is what we don't have.

12         **MR. GOLDMAN:**  Right.

13         **THE COURT:**  This is the proposed order for you,

14  Judge.  I'm happy to look at that.

15         **MR. GOLDMAN:**  Thank you.

16    And then the -- in fact, there were a number of witnesses

17  that were ordered to be here today who aren't here today.  I

18  believe the Court ordered the taint team be here, that the

19  people from the taint team be here.  They were not --

20         **THE COURT:**  Yeah.  I asked for anybody who put their

21  hands on these devices to be here.

22    But, in fairness, I also am not asking you all to put on

23  any evidence because I've gotten sort of confessed error by the

24  government of a pretty, you know, broad nature.  I'm not sure

25  what else we need to hear on it, but I'm happy for you to

 1  address that.

 2       **MR. GOLDMAN:**  I appreciate that.  I think it's just

 3  important for the record to reflect that the order was that

 4  chains of custody were provided -- were to be proposed within

 5  one hour of the end of our call yesterday, they came in after

 6  9:00 last night.  That there was, you know, briefing ordered by

 7  9:00 p.m. that wasn't provided by 9:00 p.m.  There were a

 8  number of things.

 9       And I recognize there was a lot to do yesterday, and you

10  know, there were a lot of things that the Court asked the

11  government to do yesterday afternoon.  But nevertheless, I

12  think the order -- the record should reflect that there were

13  things that weren't done because I think it continues and adds

14  to the prejudice of all the other things we've been talking

15  about, that we've been talking about during the course of

16  today.  And so we just want to make sure that reflects.

17       So if we can just prepare an order, we'll show it to the

18  government to make sure it reflects everyone's accurate

19  recollection of the hearing yesterday.

20       The hearing yesterday was recorded.  That can be

21  transcribed, I assume, promptly, along with today's hearing?

22       **THE COURT:**  I think that has to be separately

23  obtained.  In other words, it's -- you do get -- you can get

24  the recording.

25       Mr. Ulander, I'm right about that, right?  There can be a

1    digital download of the recording itself?

2           **DEPUTY CLERK:**  I am actually our transcripts clerk,

3    so I do actually provide audio recording.  And in the case of

4    needing a transcript, it would need to be accepted by one of

5    our court reporters for transcribing.

6           **THE COURT:**  I see.  Okay.  So there is a mechanism,

7    and Mr. Ulander will tell you how to get it.

8           **MR. GOLDMAN:**  Okay.  Thank you.

9           **THE COURT:**  But you can also listen to the recording.

10          **MR. GOLDMAN:**  And I took very good notes of

11   yesterday's, because I was sitting at my desk, and I was able

12   to take very good notes of that as well, but I also do want to

13   get a --

14          **THE COURT:**  I also want to be clear, I'm not going to

15   get, like, death by a thousand cuts more evidence on this, am

16   I?  I mean, the evidence is what it is.  I asked you all to

17   come today prepared to explain this to me.  This is legal

18   argument, correct?  I'm not ordering more disclosures on your

19   end.  And I'm not expecting that the government is going to

20   produce additional evidence.  I just want to know where we are

21   based on --

22          **MR. GOLDMAN:**  I would suggest on that point, that

23   there were -- I think, if you look at the motion that we filed

24   for today, I think it's Docket Number 241, where the devices

25   were sort of the first paragraph of that, but there were

1    multiple other paragraphs in there.  There are a lot of other

2    issues.  And I think we'll include that in our briefing.

3        But I just -- evidence wasn't heard on that.  It wasn't --

4    you didn't ask for us for evidence to be presented on those

5    other things, but there was substantial other argument there.

6            **THE COURT:**  Mr. Goldman, let me ask you, is it worth

7    it for us to discuss it today?  We're here.  I'm happy to hear

8    you on it.  I mean, am I just -- when I step back, I think how

9    is it, just -- you know, educate me on the law, how is it that

10   it's not well within my discretion to dismiss this case given

11   the nature of the violation?  Which is two ground zero,

12   personal knowledge co-conspirators with 17 devices to their

13   name all of which were kept by the government, defendant

14   repeatedly asked for them, never got it, government never

15   reviewed for *Brady*.

16       But if you think in that -- in your respective interest,

17   you think we're going to get to those secondary arguments, I'm

18   happy to -- let's talk about them today so they can be in the

19   pleadings.

20           **MR. GOLDMAN:**  I think what we can do today with the

21   secondary arguments, since we have it already in the briefing,

22   the government, I assume, will address those in their briefing

23   as well, and we can deal with those on the papers, based on the

24   additional materials that were provided.

25       We made a couple of mentions today, for example, the first

```
 1   proffer of Peebles, and the IRS reports, Loudoun County
 2   Sheriff's Reports.  There are other police reports that weren't
 3   provided here.  And I think we can put that in the briefing.
 4   There aren't witnesses here to talk about that.  So I think we
 5   can do that in writing.
 6          THE COURT:  So you're saying the Giglio documents?
 7          MR. GOLDMAN:  Yeah, yeah.
 8          THE COURT:  And that's fine.  I mean, if you all
 9   are -- do not need to address it in open court, you can do it
10   in writing, I'm okay with that.
11          MR. GOLDMAN:  I think that's fine.
12      And I think the -- the additional chain of custody
13   records, which are in the process of being provided, that will
14   be -- that will be --
15          THE COURT:  Part of the --
16          MR. GOLDMAN:  -- part of the briefing.  Presumably
17   we'll all get that this afternoon at some point when Special
18   Agent Kimrey gets that together.
19          THE COURT:  So, government, are you okay with
20   addressing the additional -- the additional arguments in 241
21   and the pleadings?
22          MR. GARDNER:  Yes, Your Honor.
23          THE COURT:  Is there any other evidence you wish for
24   me to consider?
25          MR. MANTHRIPRAGADA:  Evidence in terms of?
```

1         Your Honor, in terms of the issues that have been raised

2    here?

3              **THE COURT:**  Yes.

4              **MR. MANTHRIPRAGADA:**  I would suppose if there's

5    anything else, it would be in our written response, but I don't

6    think there's anything in particular that we can proffer to the

7    Court right now.

8              **THE COURT:**  Okay.  Well, your written response is

9    your legal argument.  I don't expect there's going to be

10   additional evidence.  If there is, that's going to be -- I

11   mean, for example, I don't want to see affidavits from

12   witnesses who you represented to me today told you X, and now

13   they tell you X, Y, and Z.  You know what I'm saying?  Things

14   like that.  That's really going to get complicated.

15             **MR. MANTHRIPRAGADA:**  No.  I misunderstood the Court.

16   That's clear now.  No.

17             **THE COURT:**  Okay.  All right.

18             **MR. MANTHRIPRAGADA:**  Your Honor?

19             **THE COURT:**  Yeah, go ahead.

20             **MR. MANTHRIPRAGADA:**  As far as whatever the Court

21   feels would be a reasonable time to secure the transcripts and

22   to be able to meaningfully utilize them so we have a fulsome

23   response to the Court.

24             **THE COURT:**  Well, I think the way it works is that --

25   listen, this is a problem of your own making.  This trial date

 1 │ was set.  It was not a surprise to anybody.  You're playing

 2 │ with the Court's calendar because now I -- if I take it off,

 3 │ and I end up denying dismissal, then what?

 4 │     If I keep it on, and I give some sanction short of it, and

 5 │ I do it too close to trial, now everyone is scrambling to

 6 │ respond.

 7 │     So the only thing I can think to do is to make the

 8 │ pleading requirements such that, you know, I have 24 hours to

 9 │ think about it and then give you the answer.

10 │         MR. MANTHRIPRAGADA:  Your Honor, what we can do in

11 │ the interim, to make the time fruitful, we can provide counsel

12 │ with access to Relativity, which going back to the issues of

13 │ the items that were downloaded --

14 │         THE COURT:  You sure about that?  I don't know if you

15 │ can or you can't?

16 │         MR. GOLDMAN:  I'll just say, we can't review --

17 │         THE COURT:  400,000 objects?

18 │         MR. GOLDMAN:  Yeah, we don't know many terabytes that

19 │ is.  We can't do that.

20 │         MR. MANTHRIPRAGADA:  Your Honor, from what I

21 │ understand, the Relativity process may be a little bit long, so

22 │ we could simply download the information to a hard drive and

23 │ provide the hard drive.

24 │         THE COURT:  Of 400,000 objects of 17 devices?  Is

25 │ that -- or really, you have to -- you have to download all of

1  it.  Like, you have to give all of it to the defense.

2      Are you suggesting you can do 20-something devices -- do I

3  have a terabyte count on this yet?  Because if I don't have a

4  terabyte count, if you can't give me that, I don't know if you

5  can really adequately tell me that you can give it to the

6  defense any time soon.

7      What's the total data --

8          MR. GOLDMAN:  My sense is, regardless of the data, we

9  know it's going to be far more than we can review before we

10 brief the motion.

11         THE COURT:  I was about to say, you can't brief the

12 motion and look at 27 devices?

13         MR. GOLDMAN:  Exactly.  So I think if we have a

14 deadline -- and my understanding is what the Court is asking,

15 is that there are two competing briefs.  It's not that we file

16 a brief and they file a response.  It's going to be two

17 briefs --

18         THE COURT:  Correct, I'm doing --

19         MR. GOLDMAN:  -- that are going to be filed

20 addressing their own issues due at the same time for the Court

21 to review.

22         THE COURT:  That's right.

23         MR. GOLDMAN:  Maybe there will be a short reply if we

24 have a couple --

25         THE COURT:  Or maybe another -- a followup quick

1  hearing if I have questions.  And, you know, the best I can to

2  make my ruling, if I can't do a, you know, pretty opinion, I

3  can rule from the bench.

4      So go ahead and try to produce whatever you wish to the

5  defense, but as I'm -- I am making a factual finding that three

6  human being lawyers cannot both go through 27 devices and

7  respond in a long weekend to a pleading.  That's just not --

8  that's not practical.

9      And it's not practical, frankly, to imagine that could be

10 done between now and trial with any meaningful -- with any --

11 with any meaning.

12     So you do it, and then how do you, at the same time,

13 investigate and prepare for examining witnesses in a trial that

14 now, according to the government, is going to take less than a

15 week?  I mean, it's really -- it's hard for me to imagine.

16     But maybe you'll convince me otherwise.

17     Let's make these simultaneous letter pleadings no longer

18 than ten pages, which is really 20 pages in briefing.  It just

19 makes me feel better to get it in a letter.  Let's make them

20 due by Tuesday morning.  Tuesday morning at 10:00.  Okay?  And

21 file them on ECF.

22     And I think that's all I'll need, and then I'll turn to

23 them immediately.

24     Obviously, I'll be working on this as well.

25     And then let's set a followup now, a followup hearing,

1  because if I'm -- if I'm -- whatever I decide, we're going to

2  have to do it relatively quickly for a trial that is starting

3  the following Tuesday.  So let's see.

4  How about Thursday morning, the 29th, let's meet at

5  10:00 a.m.  And what we'll do is, if the case is proceeding

6  in -- in some fashion -- the voir dire I got back to you, I

7  think, for the most part, captures all of your -- the substance

8  of your questions.  I just took what I understood to be the

9  question and often just put it in the form that fits our voir

10  dire process.  So take a look at that, because we'd have to

11  definitely have that ready to go.

12  And then we'll also talk about the -- the remaining -- by

13  that point, I should know which witnesses are implicated by

14  this -- these discovery and *Brady* violations.

15  And we'll figure out what, if anything, is left to proceed

16  on Tuesday.

17          **MR. GOLDMAN:**  And, Your Honor, just --

18          **THE COURT:**  Okay.

19          **MR. GOLDMAN:**  -- we have another motion.  There are a

20  couple of other motions that we are not talking about today,

21  but we may have additional pleadings that we need to file --

22          **THE COURT:**  Can you just sort of give me a preview so

23  I know what's coming?

24          **MR. GOLDMAN:**  I think there's going -- well, we'll

25  see how we lay it out in the motion -- in the briefing that

1  we're going to do for Tuesday, but it's possible that there's

2  going to be some additional relief.  I think we'll probably put

3  something in writing about the request for the internal

4  communications related to the things that Mr. Greenberg was

5  talking about earlier.  I think we'll probably put something

6  like that in writing with legal support for the Court.  And

7  we'll keep it as brief as we can.

8      As far as the motion to dismiss -- the other motion to

9  dismiss that was on the docket for today challenging the

10  indictment, I think that's only challenging Count One of the

11  indictment.  That was filed by predecessor counsel.  I think

12  there are additional arguments to be made around that.

13      THE COURT:  Well, I think that the motion actually

14  challenged all of the counts, didn't it?  But now the

15  government is saying it's moot because of the superseding.

16      MR. GOLDMAN:  Well, it's saying -- yes.  And it's --

17  I mean, I think it's clear -- I don't want to get into the

18  argument on that motion today, but I do think that it's not --

19  there's plenty of case law that says it's not moot because

20  we're challenging the exact same language that transferred from

21  one to the other.

22      THE COURT:  Right.

23      MR. GOLDMAN:  There are other reasons why we can

24  challenge that indictment based on other things that did change

25  from the other.  But in terms of what we challenged -- in what

1  predecessor counsel have challenged, that language is the same

2  in the superseding indictments, but that issue is not live.

3          **THE COURT:**  Right.  Right.  I don't necessarily --

4  what does it matter if someone tells me it's moot if it's not?

5  Like, for example, the 1028A counts are squarely implicated by

6  *Dubin*, and now I know about *Dubin*, and now I know that it's

7  much more restrictive than the government had previously

8  thought, perhaps when they even indicted this case.

9          So I hear you.  You know, there may be downstream

10  arguments, if we're on the eve of trial.

11          Listen, I guess, here's the other thing we can consider,

12  right?

13          If we just cannot physically get this done in time for

14  trial, then we use that time to drill down on some of these

15  issues.  But make no mistake, this is not an opportunity for

16  the government to fix it.  I'm not granting any kind of

17  continuance to now allow the government to put -- you know, do

18  what they should have done a year ago.

19          It's another way we can think about it, and you all should

20  talk about that.  But I'm really -- see, I'm very reluctant,

21  because once I start moving dates, it -- it creates a bad

22  incentive.

23          **MR. GOLDMAN:**  We appreciate that.  And this case has

24  been pending against Mr. Masood for a long time.  He's been

25  under the thumb of this for a long time.

1      **THE COURT:**  Right.

2      **MR. GOLDMAN:**  And we would like to get this resolved.

3  So we appreciate that we'll file the briefing for Tuesday, and

4  then we can come in on Thursday and make further

5  determinations.

6      I'll just note for the Court's -- I have to be at a

7  hearing in Fairfax early Thursday morning, but co-counsel will

8  be here, and I'll be here as soon as I can after that for the

9  rest of the hearing.

10     **THE COURT:**  Okay.  And then the only other issue that

11  I -- I suppose we'll deal with next week, unless you want to

12  talk a little bit about it now, but, you know, the government

13  is also asking me to deny the motion to suppress as moot.  I do

14  want some attention paid by the government as to whether any of

15  the intended evidence to be introduced at trial is at all

16  derivative to the search warrants, and the evidence that was

17  obtained, because if it is, then the issue isn't moot.  That's

18  how I'm thinking about it.

19     Does defense disagree?

20     **MR. GOLDMAN:**  No.

21     **THE COURT:**  Okay.  All right.  Anything else that we

22  need to discuss today?

23     **MR. GOLDMAN:**  Not from the defense, Your Honor.

24     **MR. GARDNER:**  Nothing from the government, Your

25  Honor.

1          **THE COURT:**  All right.  Thank you all.  I appreciate

2   your time.

3          **DEPUTY CLERK:**  All rise.  This Honorable Court now

4   stands adjourned.

5      (Proceedings were concluded at 2:36 p.m.)

1                CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, Paula J. Leeper, Federal Official Court Reporter, in

5   and for the United States District Court for the District of

6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7   the foregoing is a true and correct transcript of the

8   stenographically-reported proceedings held in the

9   above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                          Dated this 24th day of August 2024.

13

14

15                          /S/ Paula J. Leeper
                            _____
16
                            Paula J. Leeper, RPR
17                          Federal Official Reporter

18

19

20

21

22

23

24

25